HMO-W INCORPORATED, a Wisconsin corporation,
Plaintiff-Respondent-Petitioner,

v.

SSM HEALTH CARE SYSTEM, a foreign corporation,
Defendant-Appellant-Cross Petitioner,

v.

NEILLSVILLE CLINIC, S.C., a Wisconsin corporation,
Defendant.

Supreme Court

*No. 98–2834. Oral argument April 11, 2000.—Decided June 7, 2000.*

2000 WI 46

(Also reported in 611 N.W.2d 250.)

For the plaintiff-respondent-petitioner there were briefs by *Thomas M. Pyper, Theresa M. Hottenroth* and *Whyte Hirschboeck Dudek, S.C.*, Madison, and *Elizabeth Bartlett* and *Blue Cross & Blue Shield United of Wisconsin*, Milwaukee, and oral argument by *Thomas M. Pyper*.

For the defendant-appellant-cross petitioner there were briefs by *Earl H. Munson* and *La Follette Sinykin, LLP*, Madison, and *Peter B. Ritz* and *Ritz & Caflisch, S. C.*, Madison, and oral argument by *Earl H. Munson*.

¶ 1. ANN WALSH BRADLEY, J. HMO-Wisconsin (HMO-W) seeks review of that part of a published court of appeals decision that reversed a circuit court judgment and order applying a minority discount in this dissenters' rights action.[1] HMO-W contends that the court of appeals erred when it precluded the application of minority discounts in determining the fair value of dissenters' shares. We agree with the court of appeals and conclude that minority discounts may not be applied to determine the fair value of dissenters' shares in an appraisal proceeding.

¶ 2. SSM Health Care System (SSM) seeks cross-review of that part of the court of appeals decision affirming the circuit court's determination of the value of HMO-W's net assets. SSM asserts that HMO-W's unfair dealing should be considered when determining the fair value of SSM's shares and that the circuit court should have bound HMO-W to its initial represented value of the corporation's net assets. We determine that a court may consider evidence of unfair dealing as it affects the value of a dissenter's shares and that the circuit court properly addressed unfair dealing in rendering its determination of HMO-W's net value. Accordingly, we affirm the court of appeals.

¶ 3. The appraisal action at the center of this review represents the culmination of a relationship between HMO-W and SSM that spanned more than a decade. In 1983, SSM and a number of other health care providers formed HMO-W as a provider-owned health care system. All shareholders assumed minority

---

[1] *HMO-W Inc. v. SSM Health Care Sys.*, 228 Wis. 2d 815, 598 N.W.2d 577 (Ct. App. 1999)(affirming in part, reversing in part the judgment and order of the Circuit Court for Sauk County, James Evenson, J., and remanding the cause with directions).

status in this closely held corporation. SSM and the Neillsville Clinic, another shareholder, together owned approximately twenty percent of HMO-W's shares.

¶ 4. By the early 1990's, competitive pressures from within the health care business led HMO-W to explore the possibility of merging with another health care system. SSM recommended DeanCare Health Plan (DeanCare), a company with which SSM had close connections, as a potential merger partner. HMO-W later eliminated DeanCare from consideration after having met with company representatives numerous times to discuss a partnership deal. HMO-W instead proposed a joint venture with United Wisconsin Services (United).

¶ 5. Before shareholder approval of the merger, HMO-W retained Valuation Research Corporation (VR) to value HMO-W's net assets both prior to and upon the merger. VR prepared a final valuation report that HMO-W accepted and which estimated the company's net value to fall within the range of $16.5 to $18 million.

¶ 6. Subsequently, HMO-W's board of directors voted to approve the proposed merger with United and to submit the merger to a shareholder vote. In addition to the VR report, the proxy materials sent to the shareholders informed them of their statutory right to dissent to the merger. At the shareholder meeting, both SSM and the Neillsville Clinic voted against the proposed merger. The merger was nevertheless approved.

¶ 7. Both SSM and the Neillsville Clinic then perfected a demand for the payment of their dissenting shares. Wis. Stat. § 180.1323 (1997–98).[2] Abandoning

---

[2] All subsequent references to the Wisconsin Statutes are to the 1997–98 volumes unless otherwise indicated.

the VR report, HMO-W hired a new appraiser to value its assets. The appraiser arrived at a valuation of approximately $7.4 million, and based upon this valuation, HMO-W sent SSM a check for almost $1.5 million as the value of SSM's shares. Disputing HMO-W's valuation of the shares, SSM informed the company that SSM's fair value calculation of its shares yielded a figure of approximately $4.7 million.

¶ 8. Pursuant to Wis. Stat. § 180.1330(1), HMO-W instituted a special proceeding to determine the fair value of the dissenting shares. In response, SSM asserted that HMO-W was estopped from claiming a company value that was lower than the $16.5 to $18 million value it had represented to the shareholders prior to the merger vote.

¶ 9. At trial, several experts testified as to the net value of HMO-W. HMO-W's expert testified that the company's value immediately prior to the merger was $10,544,000. SSM's expert submitted the value as $19,250,000. The circuit court accepted the valuation offered by HMO-W's expert, noting various flaws in the earlier VR report that called into question the accuracy of that report.

¶ 10. Upon accepting HMO-W's valuation and observing the dissenters' minority status, the circuit court applied a minority discount of 30% to the value of the dissenting shares but refrained from applying a lack of marketability discount.[3] The circuit court con-

---

[3] A minority discount addresses the lack of control over a business entity on the theory that non-controlling shares of stock are not worth their proportionate share of the firm's value because they lack voting power to control corporate actions. *Lawson Mardon Wheaton, Inc. v. Smith*, 734 A.2d 738, 747 (N.J. 1999). A lack of marketability discount adjusts for a lack of liquidity in one's interests in a firm, on the theory that there is a

cluded that it was required to apply the minority discount as a matter of law. The court then ordered SSM and the Neillsville Clinic to repay with interest the amount by which HMO-W's initial payment exceeded the court's fair value determination.

¶ 11. SSM filed a post-decision motion requesting the court to clarify whether it had considered SSM's argument that HMO-W be estopped from asserting at the appraisal proceeding a substantially lower value of its assets than the value set forth in the initial VR report. In response, the court issued an order stating that it had considered SSM's arguments and that it was affirming its prior decision in HMO-W's favor. SSM appealed.

¶ 12. The court of appeals affirmed in part and reversed in part, remanding the case for a fair value determination without the application of a minority discount. It held as a matter of law that the Wisconsin statutes governing dissenters' rights do not allow minority discounts to be applied in determining the fair value of a dissenter's shares. *HMO-W Inc. v. SSM Health Care Sys.*, 228 Wis. 2d 815, 827, 598 N.W.2d 577 (Ct. App. 1999).

¶ 13. The court reasoned that minority discounts frustrate the purpose of dissenters' rights statutes, which protect the rights of shareholders to voice objection to corporate actions and to receive an equitable value for their minority shares. *Id.* However, the court of appeals affirmed the circuit court's determination as to HMO-W's net asset value. It concluded that SSM had failed to prove harm in reliance on the VR report

---

limited supply of potential buyers in closely held corporations. *Id.* The type of discount at issue in this case is the minority discount, and thus we do not address the applicability of a lack of marketability discount under the statute.

that initially valued HMO-W's net assets at $16.5-$18 million. *Id.* at 828–29.

¶ 14. Two issues are currently presented for review, and both are issues of first impression for this court. Initially we address the issue of whether a minority discount may apply in determining the fair value of a dissenter's shares. This inquiry involves statutory interpretation and presents a question of law. *Jefferson County v. Renz*, 231 Wis. 2d 293, 301, 603 N.W.2d 541 (1999). Second, we address whether a court in making its fair value determination may consider evidence of unfair dealing relating to the value of the dissenter's shares. This also presents a question of law. We review questions of law independently of the legal conclusions of the circuit court and the court of appeals. *Deutsches Land, Inc. v. City of Glendale*, 225 Wis. 2d 70, 79–80, 591 N.W.2d 583 (1999).

¶ 15. Tracing the evolution of dissenters' appraisal rights provides a context for the discussion of the two issues presently before this court. At common law, unanimous shareholder consent was required to achieve fundamental corporate changes. *Voeller v. Neilston Warehouse Co.*, 311 U.S. 531, 536 n.6 (1941); *Fontaine v. Brown County Motors Co.*, 251 Wis. 433, 437, 29 N.W.2d 744 (1947). Courts and legislatures questioned the wisdom of allowing one shareholder to frustrate changes deemed desirable and profitable by the majority and thus modified tradition by authorizing majority consent. Mary Siegel, *Back to the Future: Appraisal Rights in the Twenty-First Century*, 32 Harv. J. on Legis. 79, 87 (1995).

¶ 16. Although permitting the majority to approve fundamental changes was viewed as a solution to the potential stalemate attendant to a requirement

of corporate unanimity, majority consent nevertheless opened the door to victimization of the minority. *Rigel Corp. v. Cutchall*, 511 N.W.2d 519, 523–24 (Neb. 1994). In response, legislatures widely adopted statutes to address minority victimization by affording dissenters appraisal rights for their shares. *Voeller*, 311 U.S. at 536 n.6.

¶ 17. The appraisal remedy has its roots in equity and serves as a quid pro quo: minority shareholders may dissent and receive a fair value for their shares in exchange for relinquishing their veto power. *In re Valuation of Common Stock of McLoon Oil Co.*, 565 A.2d 997, 1004 (Me. 1989); Barry M. Wertheimer, *The Shareholders' Appraisal Remedy and How Courts Determine Fair Value,* 47 Duke L.J. 613, 619 (1998) [hereinafter Wertheimer]. Appraisal thus grants protection to the minority from forced participation in corporate actions approved by the majority.

¶ 18. Wisconsin law currently allows a minority shareholder to dissent from a fundamental corporate action, such as a merger, and to receive the fair value of those minority shares. Wisconsin Stat. § 180.1302(1) states that except in certain statutorily defined circumstances, "a shareholder or beneficial shareholder may dissent from, and obtain payment of the fair value of his or her shares in the event of [a merger or other enumerated corporate actions]." If the shareholder expresses dissatisfaction with the payment of shares offered by the corporate entity and complies with the appropriate procedures, a corporation may institute a special proceeding and petition the court to make a binding determination as to the fair value of the shares. *See* Wis. Stat. §§ 180.1328, 180.1330, and 180.1302(1).

716

¶ 19. We turn now to address the first issue: whether a minority discount may apply in determining the fair value of a dissenter's shares. This issue presents a question of statutory interpretation, and we examine first the statutory language to discern legislative intent. *State v. Setagord*, 211 Wis. 2d 397, 406, 565 N.W.2d 506 (1997). If the language is clear, we need not look beyond the statutory language to determine that intent. *Id.* If the statute is ambiguous, however, we resort to such extrinsic aids as legislative history and statutory purpose for guidance. *McDonough v. State Dept. of Workforce Dev.*, 227 Wis. 2d 271, 277, 595 N.W.2d 686 (1999).

¶ 20. The definition of fair value set forth in Wis. Stat. § 180.1301(4) provides:

> "Fair value", with respect to a dissenter's shares other than in a business combination, means the value of the shares immediately before the effectuation of the corporate action to which the dissenter objects, excluding any appreciation or depreciation in anticipation of the corporate action unless exclusion would be inequitable. "Fair value", with respect to a dissenter's shares in a business combination, means market value, as defined in s. 180.1130(9)(a)1. to 4.[4]

¶ 21. HMO-W maintains that under the clear language of Wis. Stat. § 180.1301(4), the circuit court

---

[4] A business combination is a sale, merger, or share exchange between a public corporation and a significant shareholder or an affiliate of the significant shareholder. Wis. Stat. § 180.1130(3). It is undisputed by both parties that the transaction at issue in this case does not qualify as a business combination.

retains the discretion to apply a minority discount in appropriate circumstances by valuing the dissenter's shares as a minority block of shares. Because the language is silent as to the applicability of a minority discount, there is no indication that the legislature aimed to curtail the court's discretion. HMO-W claims that the legislature would have so stated had it intended to impose a blanket prohibition against such a discount.

¶ 22. Although HMO-W advances a statutory interpretation permitting circuit court discretion, it fails, however, to offer a standard by which this discretion should be exercised. HMO-W does not definitively set forth any guidelines to contour the discretion it contends is inherent in the statute, including when a circuit court may apply a minority discount and how much of a discount the court should apply.

¶ 23. SSM also argues that Wis. Stat. § 180.1301(4) is unambiguous, yet maintains that the clear words of the statute reflect an opposite intent. It asserts that the legislature intended to prohibit the application of a minority discount by its chosen words. The juxtaposition of the term "fair value" in the first statutory sentence with "market value" as it relates to business combinations in the second sentence leads SSM to conclude that the legislature envisioned two distinct valuation approaches. Each approach is based on the type of shareholder asserting dissenters' rights in any particular corporate action.

¶ 24. According to SSM, the separate definition of fair value to mean market value in the context of business combinations reflects the legislative intent to define fair value for shares of non-business combinations without equating the term with fair market

value.[5] Because a minority discount represents a market concept and is premised on the theory that controlling shares are worth more on the market than non-controlling shares, SSM contends that the legislature prohibited the application of a minority discount.

¶ 25. We agree with SSM that the legislature clearly did not intend to render fair value synonymous with fair market value when appraising dissenters' shares in a non-business combination. However, this conclusion does not lift the cloak of ambiguity. The words of the statute do not directly answer whether the application of a minority discount is permitted in determining the fair value of a dissenter's shares. Because the statute is ambiguous with respect to the applicability of a minority discount, we turn to extrinsic aids for interpretive guidance.

¶ 26. The parties have not advanced, nor does there appear to be, any legislative history that is instructive in resolving this issue. We therefore proceed to examine the underlying purpose of statutes governing dissenters' appraisal rights, the evident aim of which is to protect minority shareholders.

---

[5] "Fair market value" represents the amount for which property will sell upon negotiations in the open market between an owner willing but not obliged to sell and a buyer willing but not obliged to buy. *Rosen v. City of Milwaukee*, 72 Wis. 2d 653, 661, 242 N.W.2d 681 (1976). As commentators have noted:

> "Fair value" is not the same as, or short-hand for, "fair market value." "Fair value" carries with it the statutory purpose that shareholders be fairly compensated, which may or may not equate with the market's judgment about the stock's value. This is particularly appropriate in the close corporation setting where there is no ready market for the shares and consequently no fair market value.

Joseph W. Anthony & Karlyn V. Boraas, *Betrayed, Belittled. . .But Triumphant: Claims of Shareholders in Closely Held Corporations*, 22 Wm. Mitchell L. Rev. 1173, 1186 (1996).

¶ 27. Appraisal rights represent a legislative response to the minority's lack of corporate veto power and the consequential vulnerability to majority oppression. To compensate for nominal control, the legislature granted minority shareholders the right to receive fair value for their shares if they objected to a particular corporate action.

¶ 28. Consistent with the statutory purpose in granting dissenters' rights, an involuntary corporate change approved by the majority requires as a matter of fairness that a dissenting shareholder be compensated for the loss of the shareholder's proportionate interest in the business as an entity. *McLoon Oil*, 565 A.2d at 1004. Otherwise, the majority may "squeeze out" minority shareholders to the economic advantage of the majority.

¶ 29. As the Delaware Supreme Court observed in the seminal case of *Cavalier Oil Corp. v. Harnett*, 564 A.2d 1137, 1145 (Del. 1989):

> Where there is no objective market data available, the appraisal process is not intended to reconstruct a pro forma sale but to assume that the shareholder was willing to maintain his investment position, however slight, had the merger not occurred. . . .[T]o fail to accord to a minority shareholder the full proportionate value of his shares imposes a penalty for lack of control, and unfairly enriches the majority shareholders who may reap a windfall from the appraisal process by cashing out a dissenting shareholder, a clearly undesirable result.

¶ 30. A minority discount based on valuing only the minority block of shares injects into the appraisal process speculation as to the myriad factors that may affect the market price of the block of shares. *Id.* Examining the purpose of dissenters' rights statutes, we

conclude that the application of a minority discount in determining the fair value of a dissenter's shares frustrates the equitable purpose to protect minority shareholders.

¶ 31.　A dissenting stockholder is thus entitled to the proportionate interest of his or her minority shares in the going concern of the entire company. *Weinberger v. UOP, Inc.*, 457 A.2d 701, 713 (Del. 1983). Although Wis. Stat. § 180.1301(4) defines "fair value" as "the value of the shares" immediately before the corporate action, the focus of fair valuation is not the stock as a commodity but rather the stock only as it represents a proportionate part of the enterprise as a whole. *In re Shares of Common Stock of Trapp Family Lodge, Inc.*, 725 A.2d 927, 931 (Vt. 1999); *MT Properties, Inc. v. CM C Real Estate Corp.*, 481 N.W.2d 383, 387 n.3 (Minn. Ct. App. 1992).

¶ 32.　HMO-W disputes our statutory interpretation and contends that as a consequence of our interpretation, different classes of shareholders will be subject to disparate treatment. Drawing our attention to the stock market exception under Wis. Stat. § 180.1302(4), HMO-W asserts that shareholders in publicly traded companies, except those involved in business combinations, do not have the right of appraisal but rather must accept market price for their shares and an implicit discount based on minority status.

¶ 33.　Furthermore, shareholders dissenting from a business combination are also subject to the market value for their shares notwithstanding their statutory appraisal rights. Wis. Stat. § 180.1301(4). HMO-W contends that it is therefore inequitable to afford greater protection to shareholders of closely held corporations,

as would be the unforeseen result of our interpretation of Wis. Stat. § 180.1301(4).

¶ 34. We address HMO-W's argument by noting that the language of the various statutes has created the disparity among certain classes of shareholders, in likely recognition of the difference between shareholders in public corporations and shareholders like SSM in closely held corporations. *See* Zenichi Shishido, *The Fair Value of Minority Stock in Closely Held Corporations*, 62 Fordham L. Rev. 65, 76–77 (1993). The legislature has also crafted a unique remedy for shareholders of a business combination, providing for a fair market value of their shares that is the highest sale price during the valuation period of 30 days prior to the combination. Wis. Stat. §§ 180.1130(9)(a), 180.1130(15).

¶ 35. The price of publicly traded shares generally rises upon the announcement of a proposed merger. *See* Michael C. Jensen & Richard S. Ruback, *The Market for Corporate Control*, 11 J. Fin. Econ. 5, 9–14 (1983). This inflated price often serves to offset the implicit discount based on market value. Indeed, at oral argument HMO-W acknowledged that dissenting shareholders of business combinations essentially receive a fair market value for their shares that is higher than market value. This is the statutory effect notwithstanding the use of the term "market value." Thus, we are not persuaded by HMO-W's argument that our interpretation of Wis. Stat. § 180.1301(4) contravenes legislative intent.

¶ 36. In rejecting the application of a minority discount, we join a significant number of jurisdictions that have likewise disavowed the minority discount.[6]

---

[6] *See, e.g., Cavalier Oil Corp. v. Harnett*, 564 A.2d 1137 (Del. 1989); *Rigel Corp. v. Cutchall*, 511 N.W.2d 519 (Neb. 1994); *In re*

*See* Wertheimer, 47 Duke L.J. at 641–42 (noting that majority of courts have rejected minority discount). These courts have also concluded that a minority discount thwarts the purpose of dissenters' rights statutes to protect shareholders subjected to an involuntary corporate change.

¶ 37. Reasoning against a minority discount, courts have recognized that to apply such a discount inflicts a double penalty upon the minority shareholder and upsets the quid pro quo underlying dissenters' appraisal rights. The shareholder not only lacks control over corporate decision making, but also upon the application of a minority discount receives less than proportional value for loss of that control.

¶ 38. Although we note that other courts have applied a minority discount to value dissenters' shares in an appraisal proceeding, nearly all of the cases have preceded the *Cavalier Oil* decision.[7] The rationale

*Valuation of Stock of McLoon Oil Co.*, 565 A.2d 997 (Me. 1989); *MT Properties, Inc. v. CMC Real Estate Corp.*, 481 N.W.2d 383 (Minn. Ct. App. 1992); *Woolf v. Universal Fidelity Life Ins. Co.*, 849 P.2d 1093 (Okla. Ct. App. 1992); *Friedman v. Beway Realty Corp.*, 661 N.E.2d 972 (N.Y. 1995); *Richardson v. Palmer Broadcast Co.*, 353 N.W.2d 374 (Iowa 1984); *In re Stock of Trapp Family Lodge, Inc.*, 725 A.2d 927 (Vt. 1999). *See also Arnaud v. Stockgrowers State Bank*, 992 P.2d 216 (Kan. 1999)(refusing to apply minority discount when minority shares acquired by corporation, and citing with approval jurisdictions disallowing minority discounts); *accord Hansen v. 75 Ranch Co.*, 957 P.2d 32 (Mont. 1998).

[7] *See, e.g., Armstrong v. Marathon Oil Co.*, 513 N.E.2d 776 (Ohio 1987); *Atlantic States Constr., Inc. v. Beavers*, 314 S.E.2d 245 (Ga. Ct. App. 1984); *Perlman v. Permonite Mfg. Co.*, 568 F.Supp. 222 (N.D. Ind. 1983); *McCauley v. McCauley & Son, Inc.*, 724 P.2d 232 (N.M. Ct. App. 1986); *King v. F.T.J., Inc.*, 765 S.W.2d 301 (Mo. Ct. App. 1988); *Hernando Bank v. Huff*, 609 F.

underlying the application of the minority discount set forth by these courts is that minority shares reflect impaired control in corporate decision making and therefore should be reduced in value. We find this rationale neither compelling nor equitable. Rather, the rationale underlying *Cavalier Oil* and the cases disallowing minority discounts comports more faithfully with the equity of an appraisal remedy and the purpose of protecting dissenting shareholders.

¶ 39. Our interpretation is also consistent with the approach adopted by The American Law Institute (ALI) in its *Principles of Corporate Governance: Analysis and Recommendations* (1994) [hereinafter ALI *Principles*]. Section 7.22(a) provides that the fair value of shares should reflect the value of the shareholder's "proportionate interest in the corporation, without any discount for minority status or, absent extraordinary circumstances, lack of marketability." *Id.* at 314–15.

¶ 40. Comment e to Section 7.22 further observes that the ALI follows those jurisdictions that require "the appraisal court to value the firm as a whole, not specific shares, and to allocate that value proportionately, absent extraordinary circumstances." *Id.* at 324. These extraordinary circumstances require more than an absence of a trading market in the shares. Rather, a court should apply the exception only when it determines that the dissenter has held out to exploit the transaction giving rise to appraisal so as to divert value to the dissenter that is not available to other shareholders. *Id.* at 325.

¶ 41. HMO-W introduces several cases in which a minority discount has been applied to determine the

Supp. 1124 (N.D. Miss. 1985), *aff'd*, 796 F.2d 803 (5th Cir. 1986); *Stanton v. Republic Bank of S. Chicago*, 581 N.E.2d 678 (Ill. 1991).

value of a minority shareholder's interest. *See Arneson v. Arneson*, 120 Wis. 2d 236, 355 N.W.2d 16 (Ct. App. 1984) (valuation in divorce context); *Copland v. Wisconsin Dep't of Taxation*, 16 Wis. 2d 543, 114 N.W.2d 858 (1962) (tax valuation); *In re Estate of Gooding*, 269 Wis. 496, 69 N.W.2d 586 (1955) (inheritance tax valuation). By analogy, HMO-W asserts that the rejection of this discount in appraising a dissenter's shares is thus improper.

¶ 42. However, the principles governing valuation of stock for tax or property division purposes may not be imported into the appraisal process. That is because the standard of valuation in any given context should reflect the purpose served by the law in that context. ALI *Principles*, Comment e to § 7.22 at 325.

¶ 43. Certain settings may require more conservative valuation and render minority discounts wholly appropriate. *Woodward v. Quigley*, 133 N.W.2d 38, 44 (Iowa 1965). Dissenters' rights statutes serve a distinct purpose, however, and are designed specifically to protect minority shareholders who are involuntarily subjected to significant corporate changes. This underlying purpose has its roots in equity and therefore renders improper any extrapolation from other contexts with varying rooted purposes. Charles W. Murdock, *The Evolution of Effective Remedies for Minority Shareholders and Its Impact Upon Valuation of Minority Shares*, 65 Notre Dame L. Rev. 425, 471–72 (1990).[8]

---

[8] HMO-W also contends that the prohibition against a minority discount is intended to protect shareholders in a "squeeze out" situation, not when there is a voluntary exit as in the present case. We find no support for this contention in the language of the statute. Appraisal rights are not limited to dissenters who have been forced out of the corporation by the

¶ 44. In sum, we conclude that Wis. Stat. § 180.1301(4) does not permit the application of a minority discount in determining the fair value of a dissenter's shares. A minority discount runs contrary to the protective purpose of the dissenters' rights statute by discounting a minority interest solely because it is the minority.

¶ 45. Having concluded that a minority discount may not apply in determining the fair value of a dissenter's shares, we turn next to the second issue: whether a fair value determination of a dissenter's shares may include consideration of unfair dealing in the valuation of those shares. SSM contends that in this appraisal proceeding, the circuit court should have considered HMO-W's unfair dealing in initially setting the company's net value at $16.5-$18 million and subsequently representing significantly lower values. According to SSM, the court should have bound HMO-W to its initial represented value.

¶ 46. We note at the outset that SSM has not pled breach of fiduciary duty or sought damages based on such a breach. Rather, it states that the issue of unfair dealing is raised as an affirmative defense. SSM has relied on general principles of fiduciary duty to support its contention that HMO-W's unfair dealing should be considered in the valuation of SSM's shares. SSM has also maintained from the initial stage of this action that HMO-W should be estopped from claiming a lower value in this appraisal proceeding than the value established in the initial VR report that was submitted to the shareholders.

majority. *See* Rutheford B. Campbell, Jr., *Fair Value and Fair Price in Corporate Acquisitions*, 78 N.C.L. Rev. 101, 108–09 (1999). *See also MT Properties, Inc.*, 481 N.W.2d at 388 n.5.

¶ 47. Both parties rely primarily on Delaware law to support their respective positions. HMO-W contends that SSM's allegation of unfair dealing may not be raised in a statutory appraisal proceeding but rather must be instituted in a separate action. *Alabama By-Products Corp. v. Neal,* 588 A.2d 255, 257 (Del. 1991). SSM counters that evidence of unfair dealing as it affects the value of SSM's shares may indeed be presented in an appraisal proceeding. *See Cavalier Oil,* 564 A.2d at 1143–44.

¶ 48. Wisconsin law has established that in the absence of fraud or breach of fiduciary duty, appraisal represents the exclusive remedy for a shareholder objecting to the valuation of shares under a plan of corporate merger. *Pritchard v. Mead,* 155 Wis. 2d 431, 455 N.W.2d 263 (Ct. App. 1990) (examining statutory predecessor to current appraisal statute); *Kademian v. Ladish Co.,* 792 F.2d 614 (7th Cir. 1986) (analyzing former Wisconsin appraisal statute). Appraisal is a limited remedy, and the dissenter in an appraisal proceeding may assert only a right to the fair value of the dissenter's shares. *See Kademian,* 792 F.2d at 630.

¶ 49. However, Wisconsin law has not shed light on whether evidence of unfair dealing and other misconduct in the valuation of a dissenter's shares may be presented in an appraisal proceeding. Furthermore, cases in this state have not addressed whether actions for fraud or breach of fiduciary duty must be brought as separate actions or may be consolidated with an appraisal proceeding.

¶ 50. Delaware appears to represent the jurisdiction that has most frequently addressed whether claims of misconduct and wrongdoing may be submitted in an appraisal action. Recognizing the limited

scope of an appraisal proceeding, in which the only issue to be litigated remains the valuation of a dissenter's shares, Delaware has established that claims for fraud and breach of fiduciary duty must be instituted separately. *Alabama By-Products*, 588 A.2d at 257; *Cede & Co. v. Technicolor, Inc.*, 542 A.2d 1182, 1187–88 (Del. 1988).

¶ 51. The ALI, however, observes that no apparent reason exists as to why such actions may not be consolidated with an appraisal proceeding in the discretion of the court. ALI *Principles*, Comment e to § 7.22 at 326. Endorsing the position that courts should not foster a separate and unnecessary damages forum, the ALI suggests that courts entertain claims of fraud or breach of fiduciary duty in the appraisal proceeding. *Id.* at 333–34 (Reporter's Note No. 5). Because we determine that the allegation of unfair dealing in this case directly relates to the issue of fair value, we need not answer the unresolved issue of consolidation.

■

¶ 52. When assertions of misconduct such as unfair dealing are intertwined with the value of shares subject to appraisal, a shareholder may make these assertions within the context of an appraisal action. *Cavalier Oil*, 564 A.2d at 1143. In *Cavalier Oil*, the court addressed a shareholder's allegation of corporate misconduct because, among other reasons, the allegation directly related to the fair value of his shares. *Id.*

■

¶ 53. A court determining the fair value of shares subject to appraisal must consider "all relevant factors." *Weinberger*, 457 A.2d at 713. These factors may include evidence of unfair dealing affecting the value of a dissenter's shares. Additionally, courts may examine wrongful actions in gauging or impeaching the credibil-

ity of majority shareholders with respect to their valuation contentions. *Alabama By-Products*, 588 A.2d at 257.

¶ 54. In this case, SSM's assertion of unfair dealing concerns the value of its shares. SSM neither disputes the legitimacy of the business purpose to be served by HMO-W's merger with United nor contends that the merger should be invalidated. Rather, SSM contends that HMO-W's unfair dealing directly reduced the fair value of shares owned by SSM and that the appropriate remedy for HMO-W's unfair dealing should involve valuing the entity at the original net value advanced by HMO-W: $16.5-$18 million. Because the assertion of unfair dealing relates to the value of SSM's shares, we determine that it is a proper subject for consideration in this appraisal proceeding.

¶ 55. Having determined that SSM's allegation of unfair dealing may be raised in this appraisal action, we now conclude that the circuit court adequately considered the evidence of unfair dealing in rendering its fair value determination. A fair value determination is necessarily a fact-specific process. *In re Trapp Family Lodge*, 725 A.2d at 931 (quoting *McLoon Oil*, 565 A.2d at 1003). We will not upset a circuit court's findings of fact unless they are against the great weight and clear preponderance of the evidence. *Cogswell v. Robertshaw Controls Co.*, 87 Wis. 2d 243, 250, 274 N.W.2d 647 (1979).

¶ 56. SSM invokes principles of fiduciary duty and estoppel to assert that HMO-W should be bound to the initial representation of its net asset value. Because HMO-W endorsed the VR report that it submitted as part of its proxy materials to shareholders,

and as a result secured shareholder approval for the United merger, SSM contends that HMO-W cannot now subvert the appraisal process by disavowing the VR report. If HMO-W had reservations about the validity of the report, SSM claims that HMO-W was under a duty to inform its shareholders of potential flaws, particularly in light of the significance of the report in influencing shareholder approval.

¶ 57. According to SSM, HMO-W's actions in asserting lower values in the subsequent appraisal proceedings are evidence of unfair dealing because these actions reduced the fair value of SSM's shares. SSM claims that HMO-W's unfair dealing was reflected in its decision to hire a new appraiser for the purposes of maligning the VR report and consequently offering to SSM a significantly depressed value for its dissenting shares. In remedying HMO-W's unfair dealing, SSM urges this court to bind HMO-W to the initial representation of the company's value, thereby altering the fair value of SSM's dissenting shares.

¶ 58. We note that the circuit court addressed SSM's arguments of unfair dealing in the valuation of HMO-W. The record reflects that the court examined all of the relevant evidence, including the allegations of corporate misconduct. The court determined that HMO-W had not made a material misrepresentation to its shareholders and that the initial VR report contained several flaws.

¶ 59. Upon hearing testimony from three experts and the corporate officers of HMO-W, SSM, and United, the court rendered a decision accepting the valuation of HMO-W's second appraiser. We perceive no reason for the court to have relied solely on the value and methodology of the first appraiser or to have

accepted a valuation it deemed inaccurate. The circuit court is in the best position to gauge the credibility of witnesses and the relative weight to be given to their testimony. *Cogswell*, 87 Wis. 2d at 250. Furthermore, the court decides fair value and is not required to accept any one party's represented valuation. *See* Wis. Stat. §§ 180.1301(4), 180.1330(1).

¶ 60. As the circuit court apparently concluded, SSM has failed to establish that it relied to its detriment on the initial VR report or that but for the report, HMO-W's shareholders would not have approved the United merger that forced SSM to sell its shares. *See Fritsch v. St. Croix Cent. Sch. Dist.*, 183 Wis. 2d 336, 344, 515 N.W.2d 328 (Ct. App. 1994) (detrimental reliance an essential element of estoppel claim). In this appraisal proceeding, the circuit court properly considered SSM's assertion of unfair dealing as it affected the fair value of the shares owned by SSM. The court then made a determination of HMO-W's net value that is not against the great weight and clear preponderance of the evidence.

¶ 61. In sum, we conclude that a minority discount may not be applied to determine the fair value of a dissenter's shares in an appraisal action. This discount unfairly penalizes dissenting shareholders for exercising their legal right to dissent and does not protect them from oppression by the majority. We further conclude that in an appraisal proceeding, the court may entertain assertions of misconduct that relate to the value of a dissenter's shares. In this case, the circuit court properly considered SSM's evidence of unfair dealing and rendered a determination of HMO-W's net value that is supported by the record. Accordingly, we affirm the court of appeals.

*By the Court.*—The decision of the court of appeals is affirmed.

¶ 62. WILLIAM A. BABLITCH, J., did not participate.