2001 SD 16

**FIRST WESTERN BANK WALL,**
Petitioner and Appellant,

v.

Kenneth OLSEN; Kermit Olsen; Ray S. Olsen; Roberta Olsen; Roberta Olsen, as Executrix of the Estate of Ruth E. Olsen; Walborg M. Robbins, and Karen Kunstle, Appellees.

No. 21441.

Supreme Court of South Dakota.

Argued Nov. 29, 2000.

Decided Jan. 31, 2001.

Gregory A. Eiesland, Kristi K. Wammen of Johnson Eiesland Huffman & Clayborne, Rapid City, SD, Attorneys for petitioner and appellant.

Haven L. Stuck, Donald R. Shultz of Lynn, Jackson, Shultz & Lebrun, Rapid City, SD, Attorney for appellees.

GILBERTSON, Justice.

[¶ 1.] Pursuant to SDCL 47–6–48, First Western Bank of Wall (Bank) petitioned the circuit court for a determination of "fair value" of certain fractional shares belonging to dissenting shareholders. The circuit court determined that the "fair value" of the fractional shares did not include a minority discount or a non-marketability discount. Therefore, the circuit court determined the "fair value" of the shares to be $1,414,640, rather than $601,263 as proposed by Bank. Bank appeals this determination. We affirm.

## FACTS AND PROCEDURE

[¶ 2.] Bank has its principal place of business in Wall, South Dakota, with branches in Hot Springs, New Underwood and Edgemont. It is controlled by a holding company called First Western Bancorp (Bancorp). Bancorp owned 13,680 of the Bank's 15,000 outstanding shares as of December 23, 1996. Bancorp is in turn controlled by Paul Christen (Christen) and his family who hold 86% of the voting shares of Bancorp. Christen is the President, chief executive officer and director of Bancorp. Prior to December 23, 1996, the Olsens [1] collectively owned 1,100 of the remaining shares in Bank.

[¶ 3.] On December 23, 1996, Bancorp, as the majority shareholder in Bank, voted its shares to amend Bank's Articles of Incorporation to provide for a reverse stock split of 1 to 1,250 shares. This action reduced the Olsens' interest to .88

shares. On July 2, 1997, a special shareholders' meeting was held. At that meeting, Bank shareholders [2] voted to repurchase all fractional shares.[3] The Olsens were notified of this action before it was ratified at the subsequent shareholders' meeting and they properly noted their intent to dissent. At a second meeting on July 2, Bank established the "fair value" of the fractional shares as $601,263.[4] The Olsens were notified that they had the right to payment of the fair value of their shares as well as the right to demand supplemental payment for their shares if they disagreed with Bank's estimation of fair value.

[¶ 4.] The Olsens submitted their fractional shares and collectively received $601,263 from Bank, which in turn cancelled the Olsens' shares. On August 25, 1997, the Olsens tendered their written demand for payment of a deficiency pursuant to SDCL 47–6–47. Because the parties were unable to reach a settlement, Bank petitioned the circuit court for a determination of "fair value" of the Olsens' shares on October 8, 1997. Bank claimed that "fair value" of the shares was equivalent to "fair market value." According to Bank, the value of the fractional shares should have been reduced by a minority discount due to the lack of control over corporate affairs. Under Bank's analysis, a non-marketability discount should also have been applied because the shares were not publicly traded and would be difficult to sell. The Olsens disagreed with this valuation and submitted their own proposal that fair value was equal to $1,414,640.

[¶ 5.] The circuit court determined that fair market value was not an appropriate method of valuation under South Dakota's dissenters' rights statutes. The circuit

---

1. The defendants in this action will be collectively referred to as "the Olsens." The individual parties include Kenneth Olsen, Kermit Olsen, Ray Olsen, Roberta Olsen, Estate of Ruth E. Olsen, Walborg M. Robbins, and Karen Kunstle.

2. The only stockholder in attendance was Bancorp, represented at the meeting by Christen.

3. The purpose of these actions was to qualify Bank for treatment as a sub-chapter S corporation. Pursuant to I.R.C. § 1361(b)(3)(B)(i), all shares must be held by the corporation to qualify for sub-chapter S treatment.

4. That figure represented the "book" value of the shares.

court further determined that the application of any minority or non-marketability discounts would be unjust and inequitable. Based on these findings, the trial court determined that the fair value of the Olsens' shares was $1,414,640. Judgment was entered in favor of the Olsens for the difference between that amount and the amount previously paid by Bank, or $813,377. The Olsens were also granted $207,021 in prejudgment interest. Bank presents the following two issues on appeal:

1. Whether the trial court erred in admitting the testimony of Thorstenson, the Olsens' expert appraiser.

2. Whether the trial court erred in its interpretation of "fair value" as used in SDCL 47–6–40(3).

## ANALYSIS AND DECISION

[¶ 6.] **1. Whether the trial court erred in admitting the testimony of Thorstenson, the Olsens' expert appraiser.**

[¶ 7.] When reviewing the admissibility of expert testimony, we have often stated that:

[w]e review questions of admissibility of an expert witness' testimony under an abuse of discretion standard. We have long acknowledged that the trial court has broad discretion concerning the admission of expert testimony. The trial court's decision on such matters will not be reversed absent a clear showing of an abuse of discretion.

*Nickles v. Schild*, 2000 SD 131, ¶ 7, 617 N.W.2d 659, 661 (citing *Maroney v. Aman*, 1997 SD 73, ¶ 33, 565 N.W.2d 70, 78) (additional citations omitted). Thus, for a reversal, the Bank must establish that no "judicial mind, in view of the law and the circumstances, could have reasonably reached the same conclusion." *Id.* (citing *State v. Barber*, 1996 SD 96, ¶ 14, 552 N.W.2d 817, 820).

[¶ 8.] The admission of expert testimony is governed by SDCL 19–15–2, which provides:

If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

This statute sets forth the test announced in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469, and adopted by this Court in *State v. Hofer*, 512 N.W.2d 482 (S.D.1994). Under this test, the trial judge must simply determine " 'that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand.' " Estate of Dokken, 2000 SD 9, ¶ 40, 604 N.W.2d 487, 498 (quoting *State v. Moeller*, 1996 SD 60, ¶ 52, 548 N.W.2d 465, 479). These principles are satisfied if the expert testimony is relevant and has "a reliable basis in the knowledge and experience of his discipline." *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 148, 119 S.Ct. 1167, 1174, 143 L.Ed.2d 238, 250 (1999). Bank argues that Thorstenson's testimony is irrelevant and unreliable because it "is speculative, not based on reliable foundations, and contradictory within its own definitions, and thus would be of no aid to the finder of fact in determining just compensation in this case." We do not agree.

[¶ 9.] Bank challenges both Thorstenson's qualifications as an expert as well as his expert opinion. A witness may be qualified as an expert through "knowledge, skill, experience, training, or education...." SDCL 19–15–2. Bank challenges Thorstenson's qualification because he had no experience in valuing banks prior to the present valuation.[5] Assuming Bank's claim to be true, we do not examine an expert's qualifications under such a re-

---

5. Thorstenson had previously prepared a valuation of a limited partnership which owned an interest in a bank, but had never performed a full valuation of a bank.

stricted focus. *See Nickles*, 2000 SD 131, 617 N.W.2d 659. Thorstenson has been involved in valuing closely held businesses since 1983. He is certified by the National Association of Certified Valuation Analysts, and has prepared or supervised more than seventy-five business valuation reports. In addition, through his work for clients in the area, he is familiar with the economic climate of the communities where Bank's branches are located. Thorstenson's credentials qualify him as an expert under SDCL 19–15–2.

[¶ 10.] After reviewing his expert testimony, it is clear that Thorstenson's opinions as to valuation were relevant and based on generally accepted valuation principles. Use of these generally accepted principles is sufficient to establish admissibility under *Kumho* and *Daubert*. Thorstenson examined the historical growth of the Bank's income, the financial ability of Bank to pay dividends and its general financial health, the local economic climate of Bank and its branches, as well as the number of mergers in small banks and the resulting increase in small bank stock values. He used the same methods of valuation that Bank's expert used. The difference in their valuations resulted, in part, from emphasizing one method over the other. The difference in valuation also resulted from disparate opinions as to Bank's growth rate and cash flow. These differences do not cause the valuation to become unreliable or irrelevant. Rather, determining appropriate projections and deciding which method to apply in a certain situation is the specialized knowledge that is sought from a valuation expert. Bank's objections essentially relate to the basis of Thorstenson's opinions. We have often stated that "[t]he basis of an expert's opinion is generally a matter going to the weight of the testimony rather than the admissibility." *Dokken*, 2000 SD 9, ¶ 41, 604 N.W.2d at 499 (citing *State v. Spiry*, 1996 SD 14, ¶ 16, 543 N.W.2d 260, 264 (additional citations omitted)).

Bank's real dispute here is that the circuit court accepted Thorstenson's opinion over that of Bank's expert. Bank has failed to show that the circuit court abused its discretion in so doing.

**[¶ 11.] 2. Whether the trial court erred in its interpretation of "fair value" under SDCL 47–6–40(3).**

[¶ 12.] Although the circuit court entered findings of fact and conclusions of law, we are essentially presented with a question of statutory interpretation which is a question of law, reviewed under the de novo standard. *Steinberg v. State Dept. of Military Affairs*, 2000 SD 36, ¶ 6, 607 N.W.2d 596, 599.

[¶ 13.] At common law, fundamental corporate changes could only occur with the consent of all shareholders. *Rigel Corp. v. Cutchall*, 245 Neb. 118, 511 N.W.2d 519, 523 (1994) (citing *Voeller v. Neilston Co.*, 311 U.S. 531, 535, 61 S.Ct. 376, 85 L.Ed. 322 (1941)). This rule protected minority shareholders by granting them an effective veto power over the majority. *Id.* However, this corporate hostage taking began to be looked upon with disfavor, as flexibility in modern corporations became a necessity. In response, legislatures exchanged unanimity with majority rule and the veto power was replaced by the right of dissenting shareholders to receive the fair value of their shares. *Lawson Mardon Wheaton, Inc., v. Smith*, 160 N.J. 383, 734 A.2d 738, 745 (1999).

[¶ 14.] Under South Dakota's Model Business Corporation Act, when shareholders exercise these dissenting rights, they are entitled to "fair value" for their shares. SDCL 47–6–46. In addition, dissenting shareholders are entitled to a judicial appraisal of the fair value of those shares. SDCL 47–6–48. Fair value of shares is defined as "their value immediately before the effectuation of the corporate action to which the dissenter objects, excluding any appreciation or depreciation in anticipation of such corporate action unless such exclusion would be inequitable." SDCL 47–6–40(3). Bank claims that

our precedent requires that "fair value" should be equated with fair market value. In addition, according to Bank, minority and non-marketability discounts should be applied in determining the fair market value of the shares.

[¶ 15.] Bank directs us to several of our decisions that it contends control the present situation. *See Roseland v. Faulk County Bd. of Equalization,* 474 N.W.2d 273, 275 (S.D.1991) (finding that in property tax dispute, "actual value" and "true and full value" were synonymous with fair market value); *Federal Land Bank of Omaha v. Carlson,* 411 N.W.2d 415, 417 (S.D.1987) (finding that in the context of deficiency judgment statutes, "fair and reasonable value" is equated with fair market value). Bank also notes that we have approved the application of a minority discount when valuing a closely held corporation in a division of marital assets context. *Priebe v. Priebe,* 1996 SD 136, ¶ 17, 556 N.W.2d 78, 82. In addition, Bank asserts that the Olsens should be bound by the use of a 20% minority discount applied on Ruth Olsen's 1994 federal estate tax return.

[¶ 16.] The precedent cited by Bank is not controlling in this case because the purposes and policies expressed in those cases are inconsistent with the purpose and policies behind our dissenters' rights statutes. The purpose of marital property division statutes is to effectuate a fair and equitable distribution of accumulated property. Inheritance and property tax laws operate to raise revenue for the governing body. These purposes contrast with the purpose of dissenters' rights statutes, which is to protect minority shareholders. *See HMO–W Inc. v. SSM Health Care Sys.,* 234 Wis.2d 707, 611 N.W.2d 250, 258 (2000) (HMO–W II) (noting that "the standard of valuation in any given context should reflect the purpose served by the law in that context."). Therefore, we are not bound by those prior decisions.

[¶ 17.] Having determined that our precedent is not determinative, we examine what the legislature intended by the term "fair value" in the context of dissenters' rights. Initially, it bears repeating that we are bound by what the legislature has written. *State Subsequent Injury Fund v. Federated Mut. Ins., Inc.,* 2000 SD 11, ¶ 13, 605 N.W.2d 166, 169. If the legislature intended dissenting shareholders to receive the fair market value of their shares, it would have so stated. The reason the legislature did not use the term fair market value is obvious. Fair market value has often been defined as the price a willing buyer would pay a willing seller, both under no obligation to act. *Zochert v. Nat'l Farmers Union Prop. & Cas.,* 1998 SD 34, ¶ 11, 576 N.W.2d 531, 534. Dissenting shareholders can hardly be termed "willing sellers" when, as in this case, they are being forced to sell their fractional shares. To protect minority shareholders, the legislature instead used the term fair value, defining it as the value of the shares "immediately before the effectuation of the corporate action to which the dissenter objects . . . ." SDCL 47–6–40(3). This definition implies that fair value is the value of those shares as a proportionate interest in the business as an entity, in other words as "a going concern." *See Cutchall,* 511 N.W.2d at 525 (quoting *Weinberger v. UOP, Inc.,* 457 A.2d 701, 713 (Del.1983)). An appraisal proceeding must focus "not [on] the stock as a commodity, but rather the stock only as it represents a proportionate part of the enterprise as a whole." *In re McLoon Oil Co.,* 565 A.2d 997, 1004 (Me.1989). Therefore, we must determine whether the application of minority and non-marketability discounts is compatible with valuing those shares as a proportion of a viable, living business. We will deal with each discount in turn.

[¶ 18.] **A. Minority Discount**

[¶ 19.] A minority discount is applied to account for the lack of control that a minority shareholder holds in the corporation. Because there is no control

over corporate decisions, the shares are considered less valuable than shares held by a majority shareholder. *HMO–W Inc. v. SSM Health Care Sys.*, 228 Wis.2d 815, 598 N.W.2d 577, 582 (1999) (HMO–W I). Bank argues that the circuit court should have applied a 25% minority discount to the Olsens' shares because their combined interest amounted to only 7.34% of Bank's shares. The circuit court refused to apply a minority discount stating that to do so would be unjust and inequitable and would not constitute fair value.

[¶ 20.] The leading case on valuation in the context of dissenters' rights is *Cavalier Oil Corp. v. Harnett*, 564 A.2d 1137 (Del.1989). In that case, a shareholder dissented to a merger and asserted appraisal rights pursuant to the Delaware dissenters' rights statute. *See* Del Code Ann title 8, § 262 (1991 & Supp 1998). Like SDCL 47–6–46, the Delaware statute required payment of fair value for the shares. *Id.* The court stated that, "[t]he application of a discount to a minority shareholder is contrary to the requirement that the company be viewed as a 'going concern.' " *Cavalier Oil*, 564 A.2d at 1145. The court continued on, stating that "to fail to accord to a minority shareholder the full proportionate value of his shares imposes a penalty for lack of control, and unfairly enriches the majority shareholders who may reap a windfall from the appraisal process by cashing out a dissenting shareholder, a clearly undesirable result." *Id.* This reasoning has been adopted by a majority of the courts that have examined this issue.[6]

[¶ 21.] The case of *Arnaud v. Stockgrowers State Bank*, 268 Kan. 163, 992 P.2d 216 (1999) involves a fact pattern similar to the present dispute. In *Arnaud*, the majority shareholders of a close-

ly held bank initiated a reverse stock split, leaving the minority with a fractional share, which was later eliminated. The Kansas dissenters' rights statutes required the payment of "fair value" for those eliminated shares. *See* Kan. Stat. Ann. § 17–6405 (1995). In determining the fair value, the bank applied a 23% minority discount. The Kansas Supreme Court determined that it was inappropriate to apply a minority discount to the dissenters' shares. The court stated that:

> To allow a discount under the facts of this case would discourage investments in corporations by persons who would acquire a minority interest because it would enable the majority shareholders to seize the minority shareholders' interest in the corporation to the extent a minority ... discount is allowed. Investments should be encouraged, not discouraged.

*Id.* at 220. That court would not permit such a windfall to the majority shareholder. *Id.*

[¶ 22.] A minority discount is also inappropriate because when the shares are being sold to the majority shareholder, or to the corporation itself, the very purpose of applying the discount fails. As explained by the Montana Supreme Court:

> When selling [minority shares] to a third party, the value of the shares is either the same as or less than it was in the hands of the transferor because the third party gains no right to control or manage the corporation. However, a sale to a majority shareholder or to the corporation simply consolidates or increases the interests of those already in control. Therefore, requiring the application of a minority discount when sell-

---

6. See, e.g., *HMO–W II*, 611 N.W.2d at 257; *Arnaud*, 992 P.2d at 220; *Hansen v. 75 Ranch Co.*, 288 Mont. 310, 957 P.2d 32, 41 (1998); *Friedman v. Beway Realty Corp.*, 87 N.Y.2d 161, 638 N.Y.S.2d 399, 661 N.E.2d 972, 977 (1995); *Cutchall*, 511 N.W.2d at 526; *MT Properties, Inc., v. CMC Real Estate Corp.*, 481 N.W.2d 383, 388 (Minn.Ct.App.1992); *Woolf v. Universal Fidelity Life Ins. Co.*, 849 P.2d 1093, 1095 (OklaApp 1992); *Charland v. Country View Golf Club, Inc.*, 588 A.2d 609, 612 (R.I.1991); *McLoon Oil*, 565 A.2d at 1003.

ing to an "insider" would result in a windfall to the transferee. *Hansen,* 957 P.2d at 41. In situations envisioned by our dissenters' rights statutes, the transferee will be either the majority shareholder or the corporation itself. In those situations, rather than lacking control, the transferee will have increased control over the affairs of the corporation.

[¶ 23.] We agree with the reasoning of *Cavalier Oil* and its progeny and hold that it is inappropriate to apply a minority discount when determining the fair value of dissenters' shares.

[¶ 24.] **B. Non-marketability Discount**

 [¶ 25.] We next turn to the question of whether a non-marketability discount is appropriate in dissenters' rights appraisals. Bank argues that it is entitled to apply a 15% discount to the Olsens' shares because the shares lack a ready and available market. According to Bank, because these shares have no market, those shares have less value than stock that is easily liquidated, justifying the discount. This discount is separate and distinct from the minority discount and theoretically, it would apply to all Bank stock, not simply the minority shares.

 [¶ 26.] For the reasons discussed above, and announced in *Cavalier Oil* and its progeny, we conclude that such a discount is inapplicable when valuing dissenters' shares. The appraisal process is not intended to reconstruct a *pro forma* sale. *Cavalier Oil,* 564 A.2d at 1145. The process merely values the business as a whole and divides up that value in proportion to the shares owned. *McLoon Oil,* 565 A.2d at 1004. As such, it is completely irrelevant whether the dissenting shareholders would have had a difficult time liquidating their shares. This discount is especially inapplicable in a dissenters' rights context, as a ready market does exist for the dissenters' shares, namely the majority shareholder or the corporation itself. To apply a non-marketability dis-

count to the dissenters' shares would "unfairly enrich[ ] the majority shareholders who may [attempt to] reap a windfall from the appraisal process...." *Cavalier Oil,* 564 A.2d at 1145.

[¶ 27.] **C. Conclusion**

 [¶ 28.] SDCL 47–6–48 requires dissenting shareholders be paid the fair value of their shares. The circuit court was correct in refusing to apply either a minority or non-marketability discount when determining the fair value of the Olsens' shares. The appraisal process is a compromise that avoids corporate gridlock in exchange for the fair value of dissenters' shares. Any discount that "fails to accord to a minority shareholder the full proportionate value of his shares" "penalizes the minority for taking advantage of the protection afforded by the appraisal statute ." *Lawson,* 734 A.2d at 749. Such a result frustrates the purpose of the dissenters' rights statutes, namely protection of minority shareholders, and "would inevitably encourage corporate squeeze-outs." *McLoon Oil,* 565 A.2d at 1005.

[¶ 29.] Judgment is affirmed.

[¶ 30.] SABERS, AMUNDSON and KONENKAMP, Justices, and ENG, Circuit Judge, concur.

[¶ 31.] ENG, Circuit Judge, sitting for MILLER, Chief Justice, disqualified.