2006 WY 107

Suzanne W. BROWN, individually; Suzanne W. Brown, as Successor Trustee of the Marie Arp Schroeder Testamentary Trust; and Suzanne W. Brown, as Successor Trustee of the Catherine S. Holmes Trust, Appellants (Defendants),

v.

ARP AND HAMMOND HARDWARE COMPANY, Appellee (Plaintiff).

No. 05–70.

Supreme Court of Wyoming.

Aug. 29, 2006.

Representing Appellants: Scott W. Meier, of Hickey & Evans, LLP, Cheyenne, Wyoming.

Representing Appellee: John B. "Jack" Speight & Robert T. McCue, of Speight, McCue & Associates, P.C., Cheyenne, Wyoming; Amanda Hunkins Newton, of Jones, Jones, Vines & Hunkins, Wheatland, Wyoming.

Before VOIGT, C.J., and GOLDEN, HILL *, KITE, and BURKE, JJ.

BURKE, Justice.

[¶ 1] Suzanne Brown, in her individual capacity and as successor trustee of two trusts, (collectively "Appellants"), held a minority interest in Arp and Hammond Hardware Company. The corporation executed a reverse stock split, cashing out Appellants' resulting fractional shares. Appellants exercised their right to dissent. Unable to reach an agreement concerning the value of Appellants' shares, the corporation filed an appraisal proceeding in district court. On appeal, Appellants challenge the district court's appraisal of their minority shares. They assert it was error for the district court to

* Chief Justice at time of oral argument.

apply a minority discount and a discount for trapped-in capital gains in determining the fair value of Appellants' shares. Appellants also claim assets were erroneously omitted from the valuation. We conclude that the district court erred by discounting for minority status and trapped-in capital gains. We also find error in the district court's failure to include all corporate assets in its valuation. We reverse and remand.

***ISSUES***

[¶ 2] Appellants present the following issues for review:

1) Whether the District Court erred when, under the Wyoming dissenters' rights statute, it applied a discount for hypothetical trapped-in capital gains in determining the fair value of Appellants' [i]nterest in Arp and Hammond Hardware Company.

2) Whether the District Court erred when, under Wyoming dissenters' rights statute, it applied a lack of control discount (also known as a minority interest discount) in determining the fair value of Appellants' interest in Arp and Hammond Hardware Company.

3) Whether the District Court committed clear error when, in its Findings of Fact, it failed to include the value of non-ranch assets in determining the fair value of Arp and Hammond Hardware Company as an entity, and thus undervalued the fair value of Appellants' interest in Arp and Hammond Hardware Company.

Appellee phrases the issues as follows:

1) Whether the Wyoming Business Corporation Act allows for the application of the lack of control/minority discount in a judicial appraisal proceeding pursuant to Wyo. Stat. § 17–16–1301, *et seq.;*

2) Whether this Court should defer to the finding of the District Court that appraisal proceedings are inherently fact-specific, and therefore the application of discounts should be left for the trier of fact in an appraisal proceeding;

3) Whether the District Court was correct in applying an adjustment for the built-in capital gains tax liability based on the facts of this case; and

4) Whether this Court should take into account additional assets not considered by the District Court in its valuation of Arp and Hammond.

## FACTS

[¶ 3] Arp and Hammond Hardware Company ("Arp and Hammond") is a closely-held corporation, formed in 1950 under Wyoming law. Over the years, ownership of Arp and Hammond passed to descendants of one of the company's founders. In recent history, the shares were held by four cousins. Three of the cousins, Frances Read, Doran Lummis, and Catharine Holmes each held approximately twenty percent, and the fourth cousin, Elizabeth Arp Stoddard, held approximately forty percent of the shares.

[¶ 4] The four shareholders contemplated a sale of the company's ranch to Lummis Livestock Company, LLC ("Lummis Livestock"). After discussions with counsel, the majority of the shareholders decided that a sale of stock would be preferable. On March 31, 2000, Lummis Livestock purchased the shares of Ms. Stoddard and Ms. Read for $930 per share, acquiring approximately sixty percent of the outstanding shares in Arp and Hammond. Although Ms. Holmes had previously agreed to sell the land, she did not want to sell her entire interest in the corporation. She declined to sell her shares. Subsequently, tension grew between the shareholders.

[¶ 5] Ms. Holmes eventually transferred her interest in Arp and Hammond to her daughter, Suzanne Brown, as the successor

trustee of two trusts. Ms. Brown also held four shares in her individual capacity. Collectively, Appellants held 594 shares. On June 12, 2003, Doran Lummis sold his block of shares to Lummis Livestock, of which he was a member. Consequently, of the 2,717 shares of Arp and Hammond, Lummis Livestock held 2,123 shares, or approximately 80% of the outstanding shares.

[¶ 6] On June 13, 2003, Arp and Hammond gave notice of its intention to amend its Articles of Incorporation to cause a reverse stock split. The amendment proposed a reduction in the number of shares at a rate of 2,123 to 1, and required the corporation to acquire all fractional shares. Appellants voted against the reverse stock split, but it was approved by the majority shareholder on September 25, 2003. The amendment to the Articles of Incorporation was filed with the Secretary of State on September 26, 2003.[1] Appellants' 594 shares were thereby converted to a fractional share. The resolution enacting the amendment provided that following the stock split, Arp and Hammond would purchase the fractional shares.

[¶ 7] Appellants exercised their right to dissent from the reverse stock split pursuant to Wyo. Stat. Ann. § 17–16–1302(a)(iv)(E) (LexisNexis 2005).[2] They demanded payment for their shares and deposited them with the corporation. Arp and Hammond tendered payment to Appellants in the amount it considered to be fair value, $264,924, representing $446 per share.[3] Appellants objected to the amount of the payment, and Arp and Hammond subsequently filed an action in district court, requesting an appraisal of Appellants' shares pursuant to Wyo. Stat. Ann. § 17–16–1330 (LexisNexis

---

1. The parties stipulated that the filing date, September 26, 2003, was the appropriate valuation date for the appraisal proceeding.

2. Wyo. Stat. Ann. § 17–16–1302 provides the right to dissent:

   (a) A shareholder is entitled to dissent from, and to obtain payment of the fair value of his shares in the event of, any of the following corporate actions:
   . . .

iv) An amendment of the articles of incorporation that materially and adversely affects rights in respect of a dissenter's shares because it:

   . . .

   E) Reduces the number of shares owned by the shareholder to a fraction of a share if the fractional share so created is to be acquired for cash under W.S. 17–16–604.

3. Interest was also paid for a total tender of $267,047.02.

2005).[4]

[¶ 8]  A bench trial was held October 12–14, 2004.  The parties stipulated that all of the procedural requirements and prerequisites of Wyo. Stat. Ann. § 17–16–1301, *et seq.* were met and carried out in a timely manner, allowing the district court to appraise the value of Appellants' shares.  The parties also stipulated that as of the valuation date, corporate assets included ranch land in Laramie County, a building in Cheyenne, and cash on hand.  Several other assets were identified and valued in expert appraisal reports admitted by joint stipulation.[5]  The primary focus at trial was valuation of the corporation's largest asset, the ranch property, with the parties contesting the value of particular parcels.  The parties disagreed whether certain discounts should be applied in determining the fair value of Appellants' shares.

[¶ 9]  The district court issued its Findings of Fact and Conclusions of Law on November 22, 2004.  The district court determined the value of Arp and Hammond's ranch land to be $4,203,000.[6]  Appellants' shares represented 21.86% of the shares in the company.  Applying that percentage to the $4,203,000, the district court found that the undiscounted value of Appellants' interest amounted to $918,776.

[¶ 10]  The district court considered four discounts proposed by the corporation and rejected two of the discounts.  The district court rejected a marketability discount because it would "provide a windfall to Arp and Hammond."  It also concluded that a 10% "real estate discount," as a downward adjustment to the value of the ranch land, was not warranted.[7]  However, two discounts totaling 35% were applied.  The district court found a minority discount of 30% appropriate because the majority and minority took "radically different positions concerning the future of Arp and Hammond" and the minority's desire to develop the ranch land was "subordinate to the will of the majority."  Additionally, the district court applied a 5% discount for trapped-in capital gains in anticipation that Arp and Hammond would be forced to sell some of its assets to satisfy the judgment in Appellants' favor.[8]  Applying these discounts, the district court determined that the fair value of Appellants' shares was $597,204.  Its fair value determination was based upon Arp and Hammond's ranch property and did not include any other corporate assets.  After deducting the amount Arp and Hammond had previously paid to Appellants, and adding accrued interest at 6.5%, the district court entered judgment in the amount of $357,481.13 in favor of the minority share-

---

4.  Wyo. Stat. Ann. § 17–16–1330 provides, in pertinent part:
    (a) If a demand for payment under W.S. 17–16–1328 remains unsettled, the corporation shall commence a proceeding within sixty (60) days after receiving the payment demand and petition the court to determine the fair value of the shares and accrued interest.  If the corporation does not commence the proceeding within the sixty (60) day period, it shall pay each dissenter whose demand remains unsettled the amount demanded.
    (b) The corporation shall commence the proceeding in the district court of the county where a corporation's principal office, or if none in this state, its registered office, is located.  If the corporation is a foreign corporation without a registered office in this state, it shall commence the proceeding in the county in this state where the registered office of the domestic corporation merged with or whose shares were acquired by the foreign corporation was located.
    (c) The corporation shall make all dissenters, whether or not residents of this state, whose demands remain unsettled parties to the pro-

ceeding as in an action against their shares and all parties shall be served with a copy of the petition. . . .

5.  In addition to the ranch, cash and the building in Cheyenne, the reports identified corporate assets as including other real property identified as the Highlands Village Lots, and "other assets" totaling $138,000.

6.  Neither party challenges the district court's valuation methodology or the value assigned to the ranch land of $4,203,000.

7.  Arp and Hammond does not challenge the district court's rejection of these two discounts.

8.  The district court estimated that Arp and Hammond would need to liquidate one-seventh of its land to satisfy the judgment because it was cash poor.  Anticipating capital gains taxes of approximately 34% on any sale, the district court found that one-seventh of 34%, or approximately 5%, should be deducted from the amount to be paid to the minority shareholders.

holders.[9] This appeal followed.

## STANDARD OF REVIEW

[¶ 11] "When a matter has been the subject of a bench trial before the district court, we review its factual determinations under a clearly erroneous standard and the legal conclusions *de novo.*" *Union Pacific R.R. v. Trona Valley Fed. Credit Union,* 2002 WY 165, ¶ 6, 57 P.3d 1203, 1205 (Wyo. 2002). We will not set aside a district court's findings of fact unless they are clearly erroneous or contrary to the great weight of the evidence. *Kimball v. Turner,* 993 P.2d 303, 305 (Wyo.1999). When reviewing questions of law, we afford no deference to the district court. *Harber v. Jensen,* 2004 WY 104, ¶ 8, 97 P.3d 57, 60 (Wyo.2004). Statutory interpretation is a question of law reviewed *de novo.* *Union Pacific R.R.,* ¶ 7, 57 P.3d at 1205.

## DISCUSSION

[¶ 12] As a matter of first impression, we consider the meaning of "fair value" in a dissenters' rights proceeding. Appellants take issue with three aspects of the district court's fair value determination: discounting for minority status, discounting for trapped-in capital gains taxes, and excluding non-ranch assets. They claim these errors deprived them of the fair value of their shares, which according to Appellants, is their proportionate interest in the corporation's value. In response, Arp and Hammond characterizes the fair value inquiry as a valuation question, driven by facts and subject to broad discretion. Arp and Hammond asserts that the district court did not abuse its discretion in applying the discounts at issue and asks us to defer to the district court's determination of the value of Appellants' shares. Additionally, Arp and Hammond claims Appellants have waived their right to appellate consideration of omitted non-ranch assets.

### Minority Discount

[¶ 13] The right to dissent from certain corporate action and the procedures governing such action are set forth in Article 13 of the Wyoming Business Corporation Act, at Wyo. Stat. Ann. § 17–16–1301, *et seq.* These provisions were enacted in 1989, representing Wyoming's adoption of the 1984 version of the Model Business Corporation Act (MBCA). The MBCA has also been adopted in a majority of states.[10]

[¶ 14] In the absence of fraud or illegality, a minority shareholder forced out of a Wyoming corporation has as her exclusive remedy the right to dissent and receive the fair value of her shares. Wyo. Stat. Ann. § 17–16–1302(b).[11] A reverse stock split triggers the right to dissent as an "amendment of the articles of incorporation that materially and adversely affects rights in respect of a dissenter's shares" because it "[r]educes the number of shares owned by the shareholder to a fraction of a share ... to be acquired for cash ..." Wyo. Stat. Ann. § 17–16–1302(a)(iv)(E). In exercising the right, a dissenting shareholder is entitled to receive payment for the "fair value" of her interest in the corporation. Wyo. Stat. Ann. § 17–16–1302(a). If the corporation and dissenting shareholder cannot reach an agreement concerning fair value, the corporation may seek judicial appraisal in district court. Wyo. Stat. Ann. § 17–16–1330.

[¶ 15] The dispute in this appeal centers upon the definition of fair value set forth in Wyo. Stat. Ann. § 17–16–1301(a)(iv) (LexisNexis 2005), which states:

9. Wyo. Stat. Ann. § 17–16–1330(e)(i) provides:
  (e) Each dissenter made a party to the proceeding is entitled to judgment for:
   (i) The amount, if any, by which the court finds the fair value of his shares, plus interest, exceeds the amount paid by the corporation[.]
  There is no dispute concerning the rate of interest.

10. *See* 3 Model Bus. Corp. Act Ann. § 13.01, at 13–13 (Supp 2000/01/02) for listing of jurisdictions that have adopted the MBCA.

11. Wyo. Stat. Ann. § 17–16–1302(b) states: "A shareholder entitled to dissent and obtain payment for his shares under this article may not challenge the corporate action creating his entitlement unless the action is unlawful or fraudulent with respect to the shareholder or the corporation."

"Fair value," with respect to a dissenter's shares, means the value of the shares immediately before the effectuation of the corporate action to which the dissenter objects, excluding any appreciation or depreciation in anticipation of the corporate action unless exclusion would be inequitable;

The plain language of Wyo. Stat. Ann. § 17–16–1301(a)(iv) does not specifically authorize, nor prohibit, a minority discount. *HMO–W Inc. v. SSM Health Care Sys.*, 234 Wis.2d 707, 611 N.W.2d 250, 255 (2000) (definition language does "not directly answer whether the application of a minority discount is permitted in determining the fair value of a dissenter's shares").

[¶ 16] A minority discount is an adjustment to account for a lack of control. The theory behind a minority discount is that "non-controlling shares of stock are not worth their proportionate share of the [company's] value because they lack voting power to control corporate actions." *HMO–W Inc.*, 611 N.W.2d at 253 n. 3. The district court concluded that a 30% minority discount was warranted. It is important to distinguish the minority discount and another commonly discussed discount—the marketability discount, which adjusts for a lack of liquidity.[12] The latter is not at issue in this appeal because the district court declined to apply a marketability discount, and that decision has not been appealed.

[¶ 17] We must interpret Wyo. Stat. Ann. § 17–16–1301(a)(iv) by giving effect to the legislature's intent. *Fraternal Order of Eagles Sheridan Aerie No. 186 v. State*, 2006 WY 4, ¶ 16, 126 P.3d 847, 855

(Wyo.2006). If the plain language of the statute presents an ambiguity, we employ principles of statutory construction and may use extrinsic aids to interpret the statute. *Id; Diamond B Services, Inc. v. Rohde*, 2005 WY 130, ¶ 15, 120 P.3d 1031, 1039 (Wyo. 2005). A statute may be ambiguous if it is found to be vague or uncertain and subject to varying interpretations. *Stutzman v. Office of the State Eng' r*, 2006 WY 30, ¶ 15, 130 P.3d 470, 475 (Wyo.2006).

[¶ 18] "Ultimately, whether a statute is ambiguous is a matter of law to be determined by the court." *Merrill v. Jansma*, 2004 WY 26, ¶ 28, 86 P.3d 270, 285 (Wyo.2004). We conclude that the definition of "fair value" provided by Wyo. Stat. Ann. § 17–16–1301(a)(iv) is ambiguous. Fair value is essentially defined as the value of the shares at a certain point in time. "Value" is an inherently ambiguous term.[13] In the context of discounts, other courts have also found that the statutory definition of "fair value" is ambiguous. *See, e.g., Pueblo Bancorporation v. Lindoe, Inc.*, 63 P.3d 353, 359 (Colo.2003); *Columbia Management Co. v. Wyss*, 94 Or.App. 195, 765 P.2d 207, 210 (1988); *Matthew G. Norton Co. v. Smyth*, 112 Wash.App. 865, 51 P.3d 159, 163 (Div. 1 2002).

[¶ 19] Arp and Hammond contends that the statute's silence with regard to discounts reflects a clear legislative intent to allow the district court discretion to apply them. Arp and Hammond reasons that if the legislative intent was to limit the district court's discretion, the legislature would have made that intent clear by adopting subsequent revisions to the MBCA to that effect.[14] It also sug-

---

12.     ... it is useful to understand the distinction between a marketability discount and a minority discount.  Some courts confuse those terms.  A minority discount adjusts for lack of control over the business entity on the theory that non-controlling shares of stock are not worth their proportionate share of the firm's value because they lack voting power to control corporate actions.  A marketability discount adjusts for a lack of liquidity in one's interest in an entity, on the theory that there is a limited supply of potential buyers for stock in a closely-held corporation.
*Lawson Mardon Wheaton v. Smith*, 160 N.J. 383, 734 A.2d 738, 747 (1999) (internal citations omitted).

13.  *See* Black's Law Dictionary 1586–1587 (8th ed.2004), identifying numerous concepts of "value" including "actual cash value," "book value," "cash surrender value," "liquidation value," "market value," "net value," "optimal use value," "par value," "residual value," "scrap value," "surrender value," "true value," "use value," etc.

14.  As discussed later in this opinion, the MBCA revised the definition of fair value in 1999 to expressly prohibit a minority discount.

gests that because a discount for minority status is a recognized concept in fair market valuation, it is likewise a reasonable consideration in a determination of fair value.

[¶ 20] Appellants urge us to look to the purpose of the statute and the judicial interpretation supplied by other courts. Appellants contend that the widely accepted understanding of fair value is that it represents their proportionate interest in the corporation as a whole. They assert that application of a discount for minority status undermines the purpose of a dissenters' rights proceeding. In support of their argument, Appellants state that the majority of courts have prohibited a minority discount, and that this approach represents the better reasoned interpretation of fair value under the Model Business Corporation Act. They claim that the legislature had no reason to reconsider the definition of fair value in Wyo. Stat. Ann. § 17–16–1301(a)(iv), and the failure to adopt revisions does not provide meaningful insight to legislative intent.

[¶ 21] We must resolve the ambiguity in Wyo. Stat. Ann. § 17–16–1301(a)(iv) in a manner that is reasonable and consistent with legislative intent. *Stutzman,* ¶ 15, 130 P.3d at 475. As a basic rule of statutory construction, we may determine that intent by considering the type of statute being interpreted and examining the language used in light of the objects and purposes of the statute. *Fraternal Order of Eagles Sheridan Aerie No. 186,* ¶ 16, 126 P.3d at 855. When confronted with "two possible but conflicting conclusions, we will choose the one most logically designed to cure the mischief or inequity that the legislature was attempting to accomplish." *Diamond B Services, Inc.,* ¶ 15, 120 P.3d at 1039.

[¶ 22] We are mindful that Wyo. Stat. Ann. § 17–16–1301(a)(iv) is a provision of a model act. "Decisions of other courts offer persuasive support when questions of the interpretation of uniform laws arise." *B & W Glass v. Weather Shield Mfg.,* 829 P.2d 809, 814 (Wyo.1992). This principle applies with equal force to the interpretation of a widely adopted model act, such as the MBCA. Norman J. Singer, 2B *Statutes and Statutory Construction* § 52:05, p. 318 (6th ed.2000). When the words of a statute are materially the same and where the reasoning of another court interpreting the statute is sound, "we do not sacrifice sovereign independence, nor undermine the unique character of Wyoming law, by relying upon the precedent of a foreign jurisdiction." *Iberlin v. TCI Cablevision,* 855 P.2d 716, 726 (Wyo. 1993).

[¶ 23] Dissenters' rights were not recognized at common law. Such rights have, however, been provided by Wyoming statute for some time.[15] The U.S. Supreme Court summarized the historical development of the appraisal remedy and the balance struck by dissenters' rights statutes:

At common law, unanimous shareholder consent was a prerequisite to fundamental changes in the corporation. This made it possible for an arbitrary minority to establish a nuisance value for its shares by refusal to cooperate. To meet the situation, legislatures authorized the making of changes by majority vote. This, however, opened the door to victimization of the minority. To solve the dilemma, statutes permitting a dissenting minority to recover the appraised value of its shares, were widely adopted.

*Voeller v. Neilston Warehouse Co.,* 311 U.S. 531, 535 n. 6, 61 S.Ct. 376, 378, 85 L.Ed. 322 (1941).[16]

---

**15.** For example, prior to the 1989 enactment of the MBCA, dissenters' rights were provided by W.S. § 17–1–504 (1977) (repealed), which also provided dissenting shareholders the right to receive the "fair value" of their shares in a judicial appraisal proceeding. Subsection (e) to W.S. § 17–1–504 stated, in pertinent part: "... All shareholders who are parties to the proceeding are entitled to judgment against the corporation for the amount of the fair value of their shares...." This language was carried over from W.S. § 17–36.72 (1957) (Laws 1961, ch. 85, § 72).

**16.** All states provide for the right of shareholders, who disagree with some fundamental corporate change, to dissent from the transaction and receive the value of their shares in cash. Cecile C. Edwards, *Dissenters' Rights: The Effect of Tax Liabilities on the Fair Value of Stock,* 6 DePaul Bus. L.J. 77, 86 (1993).

[¶ 24] "The appraisal remedy has its roots in equity and serves as a quid pro quo: minority shareholders may dissent and receive a fair value for their shares in exchange for relinquishing their veto power." *HMO-W Inc.*, 611 N.W.2d at 254. "Appraisal thus grants protection to the minority from forced participation in corporate actions approved by the majority." *Id.* Historically, the emphasis in appraisal proceedings was to provide "liquidity to a shareholder and a 'way out' of an involuntarily altered investment." Barry M. Wertheimer, *The Shareholders' Appraisal Remedy and How Courts Determine Fair Value*, 47 Duke L.J. 613, 615 (1998). Over the past few decades, the focus of the appraisal remedy has shifted from the liquidity function to constraining majority overreaching and protecting minority shareholders who are cashed out of their investment. Robert B. Thompson, *Exit, Liquidity, and Majority Rule: Appraisal's Role in Corporate Law*, 84 Geo. L.J. 1, 21–22 (1995); Barry M. Wertheimer, *The Shareholders' Appraisal Remedy and How Courts Determine Fair Value*, 47 Duke L.J. 613, 615–616 (1998). "The consensus that has developed among courts and commentators is that the modern dissenters' rights statute exists to protect minority shareholders from oppressive conduct by the majority." *Pueblo Bancorporation*, 63 P.3d at 363.

[¶ 25] Most modern appraisal actions arise when the majority seeks to eliminate the minority, raising concerns about majority oppression, self-dealing and opportunism.

Robert B. Thompson, *Exit, Liquidity, and Majority Rule: Appraisal's Role in Corporate Law*, 84 Geo. L.J. 1, 25–28 (1995). Minority shareholders 'cashed out' by the majority are particularly vulnerable. Robert B. Heglar, *Symposium—Fundamental Corporate Changes: Causes, Effects, and Legal Responses—Note: Rejecting the Minority Discount*, 1989 Duke L.J. 258, 271 (1989). "A transaction in which the majority shareholder is forcing the minority shareholder out of the enterprise at a price chosen by the majority is fundamentally different from the minority's voluntary decision to abandon the enterprise because of a business change proposed by the majority." F. Hodge O'Neal & Robert B. Thompson, *O'Neal and Thompson's Oppression of Minority Shareholders and LLC Members*, § 5:1, at 5–5 (2d ed.2004). Although a reverse stock split may serve a legitimate business purpose, it may also be a technique used to "squeeze out" minority shareholders. F. Hodge O'Neal & Robert B. Thompson, *O'Neal and Thompson's Oppression of Minority Shareholders and LLC Members*, § 5:11, at 5–90 (2d ed.2004).[17]

[¶ 26] Arp and Hammond argues that the definition of fair value provided by Wyo. Stat. Ann. § 17–16–1301(a)(iv) was intended to supply the district court discretion to apply a minority discount. In support of its argument, Arp and Hammond points to language in the official comment to the MBCA (1984) which states: "The definition of 'fair value' . . . leaves to the parties (and ultimate-

---

17. "A squeeze-out normally does not contemplate fair payment to the squeezees for the interests, rights, or powers which they lose." F. Hodge O'Neal & Robert B. Thompson, *O'Neal and Thompson's Oppression of Minority Shareholders and LLC Members*, § 1:1, at 1–2 (2d ed.2004).

A squeeze-out by reverse stock split occurs as follows:

> The controlling shareholder votes to amend the corporate charter . . . to reduce the number of shares outstanding by consolidating the shares so that each share is converted into a small fraction . . . of a share. . . . Most states and the Model Act give the corporation an option to acquire the fractional shares for cash. The corporation can insure a complete cash-out simply by reducing the number of shares sufficiently so that all minority shareholders have less than one share.

F. Hodge O'Neal & Robert B. Thompson, *O'Neal and Thompson's Oppression of Minority Shareholders and LLC Members*, § 5:11, at 5–90 & 5–91 (2d ed.2004) (footnotes omitted). As with other kinds of squeeze-outs, courts have split on whether a controlling shareholder should be permitted to use a reverse stock split to squeeze out minority shareholders. F. Hodge O'Neal & Robert B. Thompson, *O'Neal and Thompson's Oppression of Minority Shareholders and LLC Members*, § 5:11, at 5–92 (2d ed.2004). In this case, the district court did not make any findings concerning the purpose of the reverse stock split, and we do not consider that issue here. Suffice it to say, the parties characterize Arp and Hammond's reverse stock split differently.

ly to the courts) the details by which 'fair value' is to be determined within the broad outlines of the definition." Revised Model Bus. Corp. Act Annotated, § 13.01, at 319 (1984).[18] Those broad outlines, however, are not delineated by the MBCA or the comments thereto. According to the drafters, the definition of fair value in the MBCA left "untouched the accumulated case law about market value, value based on prior sales, capitalized earnings value, and asset value." *Id.* The comment leaves the impression that fair value was to be understood in conjunction with existing case law, and implies that future judicial decisions would help to further shape the contours of fair value. Significant for purposes of this case, the official comment does not discuss whether a minority discount is an appropriate factor to consider in fair value determinations.

[¶ 27] At the time the MBCA was adopted in Wyoming, this Court had not provided any guidance pertaining to fair value in dissenters' rights proceedings. These issues had been litigated in other states. We would turn to the familiar canon that a statute borrowed from another jurisdiction is presumed to carry with it the construction placed upon it by that jurisdiction's highest court. *Woodward v. Haney*, 564 P.2d 844, 846 (1977). However, it would be difficult to conclude that the legislature had a clear view of the judicial treatment of "fair value" and the minority discount when it adopted the MBCA. At that time, there was a split of authority concerning the availability of a minority discount in dissenters' rights appraisal proceedings. *See* Christopher Vaeth, J.D., Annotation, *Propriety of Applying Minority Discount to Value of Shares Purchased by Corporation or Its Shareholders From Minority Shareholders*, 13 A.L.R.5th 840 (1993); Robert B. Heglar, *Symposium—Fundamental Corporate Changes: Causes, Effects, and Legal Responses—Note: Rejecting the Minority Discount*, 1989 Duke L.J. 258, 260 (1989). Both parties direct our attention to subsequent legal developments in support of their positions.

[¶ 28] Shortly after Wyoming adopted the MBCA, the Delaware Supreme Court issued its decision in *Cavalier Oil Corp. v. Harnett*, 564 A.2d 1137 (Del.1989). The Delaware Su-

---

18. The official comment to the MBCA provides, in pertinent part:

> The definition of "fair value" ... leaves to the parties (and ultimately to the courts) the details by which "fair value" is to be determined within the broad outlines of the definition. This definition leaves untouched the accumulated case law about market value, value based on prior sales, capitalized earnings value, and asset value. It specifically preserves the former language excluding appreciation and depreciation in anticipation of the proposed corporate action, but permits an exception for equitable considerations. The purpose of this exception ("unless exclusion would be inequitable") is to permit consideration of factors similar to those approved by the Supreme Court of Delaware in *Weinberger v. UOP, Inc.*, 457 A.2d 701 (Del.1983), a case in which the court found that the transaction did not involve fair dealing or fair price: "In our view this includes the elements of recissory damages if the Chancellor considers them susceptible of proof and a remedy appropriate to all the issues of fairness before him." Consideration of appreciation or depreciation which might result from other corporate action is permitted; these effects in the past have often been reflected either in market value or capitalized earning value.
> "Fair value" is to be determined immediately before the effectuation of the corporate action,

> instead of the date of the shareholder's vote, as is the case under most state statutes that address the issue. This comports with the plan of this chapter to preserve the dissenter's prior rights as a shareholder until the effective date of the corporate action, rather than leaving him in a twilight zone where he has lost his former rights, but has not yet gained his new ones.

*Id.*, § 13.01, at 319–320.

The *Weinberger* decision by the Delaware Supreme Court is notable for discarding the "Delaware Block" method as the sole means of valuing corporate shares and for allowing recissory damages in an appraisal proceeding. Robert B. Heglar, *Symposium—Fundamental Corporate Changes: Causes, Effects, and Legal Responses—Note: Rejecting the Minority Discount*, 1989 Duke L.J. 258, 265 (1989). Instead of a formulaic weighing of three factors that appeared outdated and outmoded, the *Weinberger* court emphasized a court's duty to consider "all relevant factors involving the value of a company." *Id.*, 457 A.2d at 713. This direction was given in light of the "basic concept of value under the appraisal statute ... that the stockholder is entitled to be paid for that which has been taken from him, viz., his proportionate interest in a going concern." *Id. Weinberger* did not specifically address the minority discount.

preme Court rejected the minority discount, reasoning:

> The application of a discount to a minority shareholder is contrary to the requirement that the company be viewed as a "going concern." Cavalier's argument, that the only way Harnett would have received value for his 1.5% stock interest was to sell his stock, subject to market treatment of its minority status, misperceives the nature of the appraisal remedy. Where there is no objective market data available, the appraisal process is not intended to reconstruct a *pro forma* sale but to assume that the shareholder was willing to maintain his investment position, however slight, had the merger not occurred. Discounting individual share holdings injects into the appraisal process speculation on the various factors which may dictate the marketability of minority shareholdings. More important, to fail to accord to a minority shareholder the full proportionate value of his shares imposes a penalty for lack of control, and unfairly enriches the majority shareholders who may reap a windfall from the appraisal process by cashing out a dissenting shareholder, a clearly undesirable result.

*Id.,* 564 A.2d at 1145. Since *Cavalier Oil,* the split in authority has narrowed, with most courts following this seminal case. The vast majority of courts have determined that a minority discount should not be applied to determine fair value of a minority shareholder's interest. *E.g., Foy v. Klapmeier,* 992 F.2d 774, 781 (8th Cir.1993); *Stone v. Peoples Trust & Sav. Bank,* 363 F.Supp.2d 1036, 1039 (S.D.Ind.2005); *Arnaud v. Stockgrowers State Bank,* 268 Kan. 163, 992 P.2d 216, 220 (1999); *Friedman v. Beway Realty Corp.,* 87 N.Y.2d 161, 638 N.Y.S.2d 399, 661 N.E.2d 972 (1995); *Rigel Corp. v. Cutchall,* 245 Neb. 118, 511 N.W.2d 519, 526 (1994); *In re Valuation of Common Stock of McLoon Oil Co.,* 565 A.2d 997, 1004–1005 (Me.1989); *Hansen v. 75 Ranch Co.,* 288 Mont. 310, 957 P.2d 32, 42 (1998); *First Western Bank Wall v. Olsen,* 621 N.W.2d 611, 619 (S.D.2001); *Pro Finish USA, LTD. v. Johnson,* 204 Ariz. 257, 63 P.3d 288, 294 (Ct.App.2003); *Blitch v. Peoples Bank,* 246 Ga.App. 453, 540 S.E.2d 667, 670 (2000); *Woolf v. Universal Fid. Life Ins. Co.,* 849 P.2d 1093, 1095 (Okla.Ct.App.1992); *Robblee v. Robblee,* 68 Wash.App. 69, 841 P.2d 1289, 1295 (1992); *Columbia Management Co.,* 765 P.2d at 214.

[¶ 29] Expounding upon the reasoning of *Cavalier Oil,* courts have emphasized the purpose of the appraisal remedy for dissenting shareholders. "The dissenter buyout system, with its standard of fair value, contemplates that dissenters may elect to realize their pro rata share of the whole corporate value." *Pro Finish USA, LTD.,* 63 P.3d at 293. "The basic concept of fair value under a dissenters' rights statute is that the stockholder is entitled to be paid for his or her 'proportionate interest in a going concern.'" *In re 75,629 Shares of Common Stock of Trapp Family Lodge, Inc.,* 169 Vt. 82, 725 A.2d 927, 931 (1999). *See also Friedman,* 638 N.Y.S.2d 399, 661 N.E.2d at 976; *Pueblo Bancorporation,* 63 P.3d at 361; *HMO–W Inc.,* 611 N.W.2d at 256; *Blitch,* 540 S.E.2d at 670. To provide an adequate remedy, "a dissenting shareholder's position should be the equivalent of what it would have been had the fundamental change not occurred." *Hansen,* 957 P.2d at 41.

[¶ 30] Courts have also noted the obvious unfairness of discounting for minority status. Discounts at the shareholder level are "inherently unfair to the minority shareholder who did not pick the timing of the transaction and is not in the position of a willing seller." *Hansen,* 957 P.2d at 41. The minority discount "inflicts a double penalty upon the minority shareholder and upsets the quid pro quo underlying dissenters' appraisal rights. The shareholder not only lacks control over corporate decision making, but also upon the application of a minority discount receives less than proportional value for loss of that control." *HMO–W Inc.,* 611 N.W.2d at 257.

[¶ 31] Courts subscribing to the rationale of *Cavalier Oil* seek to discourage oppressive conduct by majority shareholders. "Any rule of law that gave the shareholders less than their proportionate share of the whole firm's fair value would produce a transfer of wealth from the minority shareholders to the shareholders in control. Such a rule would inevi-

tably encourage corporate squeeze-outs." *In re Valuation of Common Stock of McLoon Oil Co.*, 565 A.2d at 1005. "[A] mandatory reduction in the fair value of minority shares to reflect their owners' lack of power in the administration of the corporation will inevitably encourage oppressive majority conduct, thereby further driving down the compensation necessary to pay for the value of minority shares." *Friedman*, 638 N.Y.S.2d 399, 661 N.E.2d at 977.

[¶ 32] This view of fair value, excluding any discount for minority status, is also endorsed by the American Law Institute. ALI's Principles of Corporate Governance provide that the fair value in an appraisal proceeding should be the value of the shareholder's "proportionate interest in the corporation, without any discount for minority status or, absent extraordinary circumstances, lack of marketability." ALI Principles of Corporate Governance: Analysis and Recommendations § 7.22(a) (1994). To determine fair value, the trial court should determine the aggregate value for the corporation as an entity, and then simply allocate that value pro rata in accordance with the shareholders' percentage ownership. ALI Principles of Corporate Governance: Analysis and Recommendations § 7.22 cmt. d (1994).

[¶ 33] The prohibition on minority discounts was included in the MBCA when it was revised in 1999. The revised definition of fair value provides:

"Fair value" means the value of the corporation's shares determined:

·    (i) immediately before the effectuation of the corporate action to which the shareholder objects;

(ii) using customary and current valuation concepts and techniques generally employed for similar businesses in the context of the transaction requiring appraisal; and

(iii) without discounting for lack of marketability or minority status ...

3 Model Bus. Corp. Act Ann. § 13.01(4), at 13–3 (1998).

[¶ 34] Clearly, the majority view considers application of a minority discount incompatible with the appraisal remedy for a dis-senting shareholder. Appellants ask us to follow this approach and reject the minority discount. Recognizing that the recently amended MBCA does not permit a minority discount, Arp and Hammond argues that Wyoming's failure to similarly amend Wyo. Stat. Ann. § 17–16–1301(a)(iv) is significant. It equates the legislature's inaction to an affirmative indication of legislative intent, citing *McLean v. Hyland Enterprises, Inc.*, 2001 WY 111, ¶ 35, 34 P.3d 1262, 1271 (Wyo. 2001). In light of the legislature's failure to adopt the 1999 revisions to the MBCA, Arp and Hammond concludes that the minority discount is available in Wyoming as a matter of law. We do not attribute the significance to the legislature's inaction that Arp and Hammond advocates.

[¶ 35] "Legislative inaction has been called a 'weak reed upon which to lean' and a 'poor beacon to follow' in construing a statute." Norman J. Singer, 2B *Statutes and Statutory Construction* § 49:10, p. 112–115 (6th ed.2000). Arp and Hammond does not assert that the legislature's attention has been directed to the 1999 MBCA or the issue of minority discounts. Legislative inaction, as an aid to statutory interpretation, is more useful when the statute at issue has first been given an interpretation or implementation by an agency or a court. Although we did consider legislative inaction in *McLean* significant, that was in the context of long-standing administrative rules that had been promulgated in 1984 and applied by the agency for many years. *McLean*, ¶ 35, 34 P.3d at 1271. *McLean* did not involve the interpretation or application of a model act.

[¶ 36] An equally plausible explanation for the legislature's failure to amend Wyo. Stat. Ann. § 17–16–1301(a)(iv) is that the legislature deemed no revisions necessary. As interpreted by the majority of courts, the definition of fair value in Wyo. Stat. Ann. § 17–16–1301(a)(iv) does not permit a minority discount to be applied to dissenters' shares. If the legislature's original intent was consistent with this view, there would be no need to enact an express prohibition. *See, e.g., Carroll v. Wyoming Prod. Credit Ass'n*, 755 P.2d 869, 873 (Wyo.1988) (rejecting argument that legislature's failure to

adopt revisions to Model Business Corporations Act was meaningful).

[¶ 37] We recognize that Wyoming adopted the MBCA before *Cavalier Oil* was decided, although in the same year. *Cavalier Oil* was premised upon statutory language that did not differ significantly from Wyo. Stat. Ann. § 17–16–1301(a)(iv). Considering the purpose of dissenters' rights and the practical impact of allowing a minority discount, *Cavalier Oil* determined that the fair value of dissenters' shares could not be determined by applying a minority discount. Subsequently, the *Cavalier Oil* view flourished, despite the lack of any express prohibition on applying a minority discount found in the statutory definition of "fair value" in the 1984 MBCA. The 1999 MBCA appears to have embraced *Cavalier Oil* and its progeny.

[¶ 38] In other states where legislatures have not yet adopted the 1999 amendments to the MBCA, courts have nonetheless considered the 1999 MBCA amendments persuasive on the issue of whether to allow discounts in determining fair value. *Pueblo Bancorporation*, 63 P.3d at 368. "A number of states have rejected such discounts since the revisions to the Model Act, without benefit of amendments to their statutes." *Matthew G. Norton Co.*, 51 P.3d at 164. For example, the court in *Matthew G. Norton* concluded "the fact that our legislature has not amended chapter 23B.13 RCW to conform to the most recent revisions to the Model Act does not preclude the courts of this state from disapproving such discounts as may be inappropriate in ascertaining 'fair value.'" *Matthew G. Norton Co.*, 51 P.3d at 164. And despite its legislature's failure to adopt the most recent version of the MBCA, the Alabama Supreme Court nevertheless took note of its clear intent and viewed "the 1999 revision as reflective of the majority view in states that have adopted the MBCA." *Ex parte Baron Servs.*, 874 So.2d 545, 549 n. 5 (Ala.2003). *Accord Blitch*, 540 S.E.2d at 670.

[¶ 39] Characterizing appraisal proceedings as fact-intensive, Arp and Hammond urges us to afford discretion to the district court's findings. It points to the district court's determination that the application of discounts is a matter of fact rather than a question of law. Arp and Hammond emphasizes the particular facts of this case, characterizing the Appellants and Ms. Holmes as a troublesome, meddling, difficult minority, making the reverse stock split necessary for the continued viability of the company. Arp and Hammond stresses the desire of the minority to sell or develop the corporation's real estate instead of using it for ranching and makes numerous references to prior litigation initiated by Ms. Holmes against the majority.[19] These facts, Arp and Hammond contends, justify the discounts applied by the district court.

[¶ 40] Although the record reflects a troubled history between the shareholders, we cannot overlook the ultimate cause of this appraisal proceeding, which is the reverse stock split forcing the Appellants out of the corporation.[20] Wyoming law provides the dissenters' rights appraisal remedy for this situation. Arp and Hammond is correct that questions concerning valuation of closely-held stock will often be fact-dependent, requiring discretionary weighing by the district court. *Neuman v. Neuman*, 842 P.2d 575, 582 (Wyo.1992). However, we decline to defer to the district court's approach in this case because we conclude that the availability of a minority discount in a dissenters' rights appraisal proceeding is a question of law.[21] We

---

19. The referenced litigation arose after Lummis Livestock became the majority shareholder in Arp and Hammond. In a financing transaction, Arp and Hammond pledged its assets as security for a loan to Lummis Livestock. Ms. Holmes sued to set aside the transaction with the suit being resolved when Lummis Livestock refinanced its note with the bank, releasing the collaterized assets owned by Arp and Hammond.

20. Arp and Hammond argues that the facts of this case present "extraordinary circumstances"

and that under this exception, a minority discount should be available. However, the exception for extraordinary circumstances pertains to the marketability discount, not the minority or lack of control discount. ALI Principles of Corporate Governance: Analysis and Recommendations § 7.22(a) (1994).

21. In support of the district court's approach, Arp and Hammond cites to several other cases discussing fair value appraisal proceedings as equitable and inherently factual. *E.g., Stanton v.*

do not defer to the district court's legal conclusions. *Fraternal Order of Eagles Sheridan Aerie No. 186*, ¶ 16, 126 P.3d at 855. While courts do not all agree whether the determination of "fair value" is a factual or legal one, most generally agree that a minority discount is not available as a matter of law.[22]

[¶ 41] Additionally, to the extent that Arp and Hammond argues that "fair value" can be equated with "fair market value," we must reject that interpretation. Courts construing the meaning of "fair value" have emphasized the policies served by dissenters' rights statutes. In doing so, they have generally rejected the notion that the ambiguity in the term fair value can be resolved by simply resorting to fair market valuation. "It is clear ... that our legislature's use of the term 'fair value' was not a slip of the pen—

the legislature did not intend to say 'fair market value' instead." *Matthew G. Norton Co.*, 51 P.3d at 163. "A dissenting shareholder is not in the position of a willing seller, however, and thus, courts have held that fair value cannot be equated with 'fair market value.'" *In re 75,629 Shares of Common Stock of Trapp Family Lodge, Inc.*, 725 A.2d at 931. "The dissenter's rights statute is not designed to produce the equivalent of a sale on the open market; rather, it is a legislative remedy for minority shareholders who find their interests threatened by significant corporate changes and who may have no other recourse." *Columbia Management Co.*, 765 P.2d at 214. "A minority discount based on valuing only the minority block of shares injects into the appraisal process speculation as to the myriad factors that may affect the

*Republic Bank of S. Chicago*, 144 Ill.2d 472, 163 Ill.Dec. 524, 581 N.E.2d 678, 683 (1991) (fair value is matter for court to determine based on credible expert testimony); *Balsamides v. Protameen Chems.*, 160 N.J. 352, 734 A.2d 721, 730 (1999); *Matthew G. Norton Co.*, 51 P.3d at 165 ("Even those courts that generally will not apply such a discount do not support a blanket rule that, 'as a matter of law,' a marketability discount should *never* be considered.") (emphasis in original).

Our review of this authority does not convince us that application of a minority discount is a matter of discretion for the district court. Illinois does consider discounts a discretionary matter for the trial court. *Stanton*, 144 Ill.2d 472, 163 Ill.Dec. 524, 581 N.E.2d 678; *Jahn v. Kinderman*, 351 Ill.App.3d 15, 286 Ill.Dec. 466, 814 N.E.2d 116, 125 (2004). However, that approach places Illinois in a very small minority of jurisdictions that allow minority discounts; a position that has been criticized. Charles W. Murdock, *Squeeze-outs, Freeze-outs, and Discounts: Why Is Illinois in the Minority in Protecting Shareholder Interests?* 35 Loy. U. Chi. L.J. 737 (Spring 2004). Several of the other cases are inapposite to the minority discount at issue in this case, but in a general sense, they actually support Appellants' argument that the question is one of law. *Balsamides* involved an oppressed minority shareholder requesting dissolution of the corporation, and the discount at issue was a marketability discount, not a minority discount. Still, the court in *Balsamides* noted that "the determination of whether a 'marketability discount' is applicable implicates a question of law, and also is subject to *de novo* review." *Balsamides*, 734 A.2d at 732. Citing *Balsamides*, the Minnesota Supreme Court likewise determined that *de novo* review was appropriate because the applicability of a marketability discount present-

ed a question of law. *Advanced Commun. Design, Inc. v. Follett*, 615 N.W.2d 285, 289 (Minn. 2000).

**22.** *See Hogle v. Zinetics Med., Inc.*, 2002 UT 121, ¶ 10, 63 P.3d 80, 87 (Utah 2002) (While the ultimate determination of fair value is a question of fact, the determination of whether a given fact or circumstance is relevant to fair value is a question of law which is reviewed *de novo.*); *Arnaud v. Stockgrowers State Bank*, 268 Kan. 163, 992 P.2d 216, 220–221 (1999) (answering certified question of law that minority and marketability discounts should not be applied when the fractional share resulted from a reverse stock split intended to eliminate a minority shareholder's interest in the corporation); *Hansen*, 957 P.2d at 37 (issue of minority discount was legal in nature); *Wenzel v. Hopper & Galliher, P.C.*, 779 N.E.2d 30, 39 (Ind.Ct.App.2002) (minority discount was improper as a matter of law); *First Western Bank Wall*, 621 N.W.2d at 616 (trial court's refusal to apply discounts was essentially question of statutory interpretation reviewed *de novo*); *Stone*, 363 F.Supp.2d at 1039 (minority and non-marketability discounts are prohibited as a matter of Indiana law); *HMO–W Inc.*, 611 N.W.2d at 253 (issue of whether minority discount may apply in determining the fair value of dissenter's shares involves statutory interpretation and presents question of law); *Columbia Management Co.*, 765 P.2d at 209 (application of minority and marketability discounts presented issue of law). *But see, e.g., Richton Bank & Trust Co. v. Bowen*, 798 So.2d 1268, 1273–1274 (Miss. 2001) (trial court's refusal to apply minority discount upheld as appropriate exercise of discretion); *Pro Finish USA, LTD.*, 63 P.3d at 291 (whether trial court properly applied statutory fair value standard to facts of this case is a mixed question of law and fact reviewed *de novo*).

market price of the block of shares." *HMO–W Inc.*, 611 N.W.2d at 256.

Applying a discount is inappropriate when the shareholder is selling her shares to a majority shareholder or to the corporation. The sale differs from a sale to a third party and, thus, different interests must be recognized. When selling to a third party, the value of the shares is either the same as or less than it was in the hands of the transferor because the third party gains no right to control or manage the corporation. However, a sale to a majority shareholder or to the corporation simply consolidates or increases the interests of those already in control. Therefore, requiring the application of a minority discount when selling to an "insider" would result in a windfall to the transferee. This is particularly true since the transferring shareholder would expect that the shares would have at least the same value in her hands as in the hands of the transferee.

*Hansen*, 957 P.2d at 41.

[¶ 42] We join the majority of courts in holding, as a matter of law, that a minority discount may not be applied in determining the fair value of a dissenting shareholder's interest. We conclude that fair value in Wyo. Stat. Ann. § 17–16–1301(a)(iv) must not include a minority discount in order to be consistent with the purpose served by the dissenters' rights statutes. "The dissenters' rights statute serves as the primary assurance that minority shareholders will be properly compensated for the involuntary loss of their investment. The remedy protects the minority shareholders ex ante, by deterring majority shareholders from engaging in wrongful transactions, and ex post, by providing adequate compensation to minority shareholders." *Pueblo Bancorporation*, 63 P.3d at 364. While it is true that dissenters' rights are equitable in nature, equity does not afford the district court discretion to offend the purpose of the statute. The remedy provided to a minority shareholder was not designed to encourage majority shareholder oppression. "To include a minority discount would simply penalize [the dissenting shareholder] while allowing the corporation to buy his shares cheaply. That is not

the protection that the legislature had in mind or that other courts have provided." *Columbia Management Co.*, 765 P.2d at 214.

[¶ 43] In a dissenters' rights appraisal, the focus of the valuation "is not the stock as a commodity, but rather the stock only as it represents a proportionate part of the enterprise as a whole." *In re Valuation of Common Stock of McLoon Oil Co.*, 565 A.2d at 1004. "Thus, to find fair value, the trial court must determine the best price a single buyer could reasonably be expected to pay for the corporation as an entirety and prorate this value equally among all shares of its common stock. Under this method, all shares of the corporation have the same fair value." *In re 75,629 Shares of Common Stock of Trapp Family Lodge, Inc.*, 725 A.2d at 931 (citing *McLoon Oil*, 565 A.2d at 1004).

[¶ 44] Accordingly, we find that the fair value of Appellants' shares should not have been adversely impacted by Appellants' status as minority shareholders. The district court erroneously applied a 30% minority discount. Appellants are entitled to a modified judgment reflecting the district court's determination of their proportionate value of the corporation without the minority discount.

### Discount for Trapped–In Capital Gains

[¶ 45] Next, we consider Appellants' challenge to the 5% discount applied by the district court to account for potential future tax consequences. The district court found the corporation was "cash poor" and estimated that Arp and Hammond would need to sell some of its assets in order to satisfy the judgment awarded to Appellants. A sale, the district court reasoned, would likely result in tax consequences. Appellants claim that the discount was not supported by the evidence and is based upon a theory that conflicts with the meaning of fair value. We agree.

[¶ 46] The 5% discount applied by the district court does not result in fair value pursuant to Wyo. Stat. Ann. § 17–16–1301(a)(iv). The fair value of Appellants' shares is measured "immediately before the effectuation of the corporate action to which

the dissenter objects, excluding any appreciation or depreciation in anticipation of the corporate action unless exclusion would be inequitable." Wyo. Stat. Ann. § 17–16–1301(a)(iv). This language generally excludes costs that may be incurred after effectuation of the corporate action causing the shareholder to dissent, and such costs should not be assessed against the dissenting shareholders. *Hansen*, 957 P.2d at 43. The valuation date for Arp and Hammond was September 26, 2003. As of that date, no sale of assets was contemplated.

[¶ 47] Nevertheless, Arp and Hammond contends that it would be inequitable to not apply the discount in this case. It claims that liquidation was anticipated because it would be the only way the corporation could pay for Appellants' shares. This justification for applying a tax discount has been rejected as inconsistent with the remedy provided by the dissenting shareholder's right to appraisal:

Under the dissenters' rights statute, the court is required to value the corporation as "a going concern."

Accordingly, courts have generally rejected any tax discount "unless the corporation is undergoing an actual liquidation." Here, there was no evidence that TFL was undergoing liquidation on the valuation date. Indeed, the evidence indicated that TFL was a going concern. Thus, the trial court correctly declined to consider the tax consequences of the sale of any assets.

TFL maintains that it will have to sell assets in order to pay the dissenters for their shares, and that therefore the tax consequences of the sale should be considered in the valuation. Under the dissenters' rights statute, however, the dissenters are entitled to a pro rata share of the fair value of the corporation immediately before the merger. "Thus, if costs are incurred after effectuation of the exchange, those costs should not be assessed against the dissenting shareholders." Accordingly, it would be inappropriate to consider a future sale of assets to determine the fair value prior to merger.

*In re 75,629 Shares of Common Stock of Trapp Family Lodge, Inc.*, 725 A.2d at 934 (internal citations omitted).

[¶ 48] Courts generally find that "unless the corporation is undergoing an actual liquidation, the liquidation method is not an appropriate method of valuing shares of a dissenting shareholder." *Hansen*, 957 P.2d at 42.[23] As one commentator observed:

The purpose of the remedy given to dissenting shareholders is to compensate them for the fair value of their shares. The process is designed to arrive at a value based upon what the shareholder is forced to give up as a result of the transaction triggering the right to dissent. Based upon that purpose, ... neither immediate tax consequences nor deferred tax consequences of the triggering transaction should be considered in determining the fair value of dissenters' shares. To consider such tax consequences would not only violate the clear language of most statutes, but also charge dissenting shareholders with taxes which would not accrue but for the transaction itself or taxes which may never accrue.

... when a court is valuing the assets of a corporation as a part of valuing the corporation as a whole, tax effects should be considered only in the most limited circumstances. Such tax consequences should be considered only when a sale of those assets is imminent and unrelated to the transaction which triggered the shareholders' right to dissent.

23. However, we recognize that a future sale might impact fair value under appropriate circumstances.

... while discounts for built-in capital gains are not generally appropriate in dissenters' rights appraisal cases where no liquidation of the corporation is contemplated, such discounts might be appropriate, at the corporate level, if the business of the company is such that appreciated property is scheduled to be sold in the foreseeable future, in the normal course of business.

*Matthew G. Norton Co.*, 51 P.3d at 168. If a sale is contemplated, before applying a tax discount, a trial court should also consider whether the shareholder will "effectively be paying his or her proportionate share of the tax on this same appreciation, upon taxation of the proceeds of sale of his or her appreciated stock back to the corporation." *Id.* at 169.

Cecile C. Edwards, *Dissenters' Rights: The Effect of Tax Liabilities on the Fair Value of Stock*, 6 DePaul Bus. L.J. 77, 98–99 (1993).

[¶ 49] Additionally, Arp and Hammond did not present evidence to support its assertion that a judgment favoring Appellants would force a sale of corporate assets. The district court found that "Arp and Hammond's proof as to the availability of this discount is somewhat sketchy ..." From our review of the record, that may be a generous description. The undisputed testimony indicated that there were no current plans to sell any of Arp and Hammond's land, unless such action was required to pay the judgment to Appellants. There was no evidence identifying the property that might be sold, the date of sale, or the taxable basis for the property. In the absence of specific facts about a prospective sale, "[i]t would be the basest form of speculation to attempt to determine tax consequences of a voluntary liquidation of assets at an unknown future time." *Hall v. Hall*, 2005 WY 166, ¶ 16, 125 P.3d 284, 289 (Wyo.2005).

[¶ 50] Under the circumstances of this case, a discount for trapped-in capital gains taxes should not have been a consideration in the fair value of Appellants' shares because it was premised upon action contemplated by the corporation subsequent to (or because of) the reverse stock split. Additionally, the district court lacked an evidentiary basis to calculate the discount when the nature, timing, and details of a sale were speculative. Application of the 5% discount for trapped-in capital gains was erroneous.

### Omission of Non–Ranch Assets

[¶ 51] In their final claim of error, Appellants contend that the district court did not award the fair value of their shares because several corporate assets were not included. In valuing the corporation, the district court focused upon the ranch land. The district court assigned a dollar amount to each parcel. The parcel values were added to arrive at the corporation's undiscounted value of $4,203,000. Neither party challenges the value assigned to the ranch. However, several non-ranch assets—a commercial building in Cheyenne, the cash on

hand, and other corporate assets, were not mentioned in the district court's findings of fact and conclusions of law. Appellants contend the district court should have included the following values for these omitted assets in its fair value determination: $477,584 for cash, $252,400 for the building in Cheyenne, $64,000 for other real property identified as the Highlands Village Lots, and $138,000 of other assets.

[¶ 52] Arp and Hammond does not dispute the existence of non-ranch assets or that the district court did not include these other assets in its decision. However, Arp and Hammond argues that Appellants had an opportunity to bring the omission to the attention of the district court, and failing to do so, should be precluded from raising this issue on appeal. "The justification for the rule foreclosing appellate consideration is that it is unfair to reverse a ruling of a trial court for reasons that were not presented to it, whether it be legal theories or issues never formally raised in the pleadings nor argued to the trial court." *Oatts v. Jorgenson*, 821 P.2d 108, 111 (Wyo.1991). Based upon our review of the record, we conclude that the issue of non-ranch assets was presented to the district court for consideration.

[¶ 53] Prior to trial, the parties stipulated that the corporation owned a commercial building in Cheyenne and had cash on hand, but the value of this property was not stated in the stipulation. Appellants submitted proposed findings of fact to the district court that pertained to the issue raised on appeal. Appellants proposed a value for all of the corporation's ranch real estate of $5,357,900, and then stated "Arp and Hammond's total value is $6,242,164." On appeal, Appellants explain the $884,264 difference between the two figures as the sum total of omitted assets, minus an undisputed liability for income taxes in the amount of $47,720. Although the non-ranch assets were not specifically listed or identified in Appellants' proposed findings, the difference between the two stated value figures suggests that assets other than the ranch real estate were involved. Similarly, the same two values were introduced at trial as exhibits supporting Appellants' proposal for valuing of the corporation.

[¶ 54] Furthermore, Arp and Hammond's position that non-ranch assets were not at issue or were not properly presented to the district court is undercut by evidence that it presented at trial. Arp and Hammond's appraisal expert prepared a report that was admitted into evidence by joint stipulation. Within that report, the building in Cheyenne was identified and valued at $252,400. Other real property, the Highlands Village Lots, was identified and valued at $64,000. Additionally, cash totaling $477,584 and "other assets" amounting to $138,000 were included in the appraiser's list of corporate assets. Testimony presented by Arp and Hammond also identified cash, the building in Cheyenne, and other real estate as corporate assets.

[¶ 55] The record reveals undisputed evidence establishing values for the cash ($477,-584), the building in Cheyenne ($252,400), and the Highlands Village Lots ($64,000). The district court's failure to incorporate these values into its determination of fair value was clearly erroneous. The nature of the other assets totaling $138,000 is not apparent from the record, and to the extent those assets are not in dispute, that value should also be included. Upon remand, the district court should determine the value of Arp and Hammond by adding the value of the non-ranch assets to $4,203,000—the amount previously determined by the district court to be the undiscounted value of Arp and Hammond's ranch property. The undisputed tax liability of $47,720 should be subtracted from the total value. The fair value of Appellants' shares may then be determined as a proportionate share (21.86%) of the total corporate value, minus amounts already paid by Arp and Hammond, plus interest.

### CONCLUSION

[¶ 56] We conclude that in a dissenters' rights action pursuant to Wyo. Stat. Ann. § 17–16–1301, *et seq.*, "fair value" of a minority shareholder's interest may not be discounted for minority status. The district court erred by applying a minority discount. The district court also erred by applying a discount for trapped-in capital gains because it was based upon potential corporate action after the date of valuation for determining fair value under Wyo. Stat. Ann. § 17–16–1301(a)(iv) and it was not supported by evidence. Finally, the district court erred in omitting corporate assets from its calculation of fair value. The judgment is reversed, and we remand this matter to the district court for further proceedings consistent with this opinion.